87 N. J. Eq.            In re Flynn.

In the matter of the application of KATHERINE FLYNN for a
writ of *habeas corpus, &c.*

[Decided April 2d, 1917.]

1. On application to secure the custody of an infant, the broad gen-
eral equity jurisdiction of the chancellor as *parens patriæ* is invoked.

2. A stepfather or stepmother as such has no right to the custody of
a stepchild.

3. Persons standing *in loco parentis* have a right of custody as against
strangers.

4. The statutory right of custody applies only to parents or guardians.

5. Where the father of an infant remarried, and on his death intestate,
the mother retained the custody of the infant, she was left *in loco par-
entis,* and her rights were supreme.

6. In the father's lifetime, under the English rule, he has the absolute
right to determine the religious education of the child.

7. In appointing a guardian for an infant by the orphans court or
the ordinary, the religious training of the child is entitled to considera-
tion, but so far the New Jersey courts have not adopted the English
rule of giving directions to the guardian in regard to the matter.

8. *Quære.* Whether the chancellor of New Jersey in the exercise of
his jurisdiction as *parens patriæ* in a *habeas corpus* case which brings
before him an infant of tender years, in awarding the custody of the
infant will follow the English precedents in proceedings for the appoint-
ment of guardians and make an order directing in what religious faith
the infant must be brought up.—*Held,* that this question need not be
considered in the absence of proof that the stepmother was not con-
tinuing the child's education according to the Roman Catholic faith,
but the order would contain a reservation under which application could
be made at any time in the future by petition charging the stepmother
with proselytizing the infant, and upon such petition the questions
above indicated with reference to the duty and power of the chancellor
of New Jersey could be determined.

Heard on petition for writ, return to writ, travers and testi-
mony taken in open court.

Mr. *Joseph Anderson, Sr.,* for the petitioner.

Mr. *John Warren,* for the respondents.

STEVENSON, V. C.

The object of this proceeding is to determine the custody of an infant male child, six years of age, domiciled in New Jersey. The petitioner, Katherine Flynn, is the child's stepmother—the second wife of his deceased father. One of the respondents, Mary Clancy, is the infant's deceased father's sister, and the other respondent, James Clancy, is her husband. A writ of *habeas corpus* was issued in accordance with the prayer of the petition, and the infant was produced before the court upon the return of the writ. No objection has been made to the form of the writ.

1. It is not the limited jurisdiction upon *habeas corpus* which is exercised by the justices of the supreme court as well as the chancellor which is invoked in this case. The petition is not directed toward freeing this little child from imprisonment. The pleadings set forth in detail the claims of the contending parties to the custody of the infant, and the proofs have been directed toward sustaining and defeating respectively each of these hostile claims. The broad jurisdiction which is invoked is the "general equity jurisdiction over the custody of the person of infants which the chancellor exercises as *parens patriæ.*" *In re Barry, 61 N. J. Eq. 135, 137.* The nature and extent of the jurisdiction of the court of chancery in this case has been expounded in a line of cases, beginning with the leading case of *Baird* v. *Torrey (Court of Errors and Appeals, 1868), 19 N. J. Eq. 481.* See, also, *Richards* v. *Collins (Court of Errors and Appeals, 1869), 45 N. J. Eq. 283; Rossell* v. *Rossell (Chancellor Magie, 1903), 64 N. J. Eq. 21, 22; Cunningham's Case (Vice-Chancellor Stevens, 1901), 61 N. J. Eq. 454; English* v. *English (Court of Errors and Appeals, 1880), 32 N. J. Eq. 738, 740.*

2. John J. Flynn, the father of the infant, was married to the petitioner, a spinster, about forty-eight years of age, and somewhat older than himself, on December 15th, 1915. Mr. Flynn then had three children by his first wife, aged, respectively, eleven, six and four years. Mr. Flynn was a Roman Catholic, as also his first wife had been, and the evidence indicates that his attachment to his church was not merely nominal. The petitioner was a Protestant, belonging to the Lutheran communion.

The union appears to have been happy, and was certainly advantageous to Mr. Flynn because his health soon failed, and for some period prior to his death, which occurred on July 20th, 1916, he appears to have been supported by his second wife. Mr. Flynn, and this is the matter of consequence, brought his children to the home of his second wife, where she was residing at and before the time of the marriage, and the children became attached to the petitioner whom they called mother, and there is nothing to show that they did not receive all the care and perhaps almost the affection which they would have received if this worthy woman had in fact been their mother.

It is also important to note that the religious education of these children was continued in accordance with the father's wish, and with the acquiescence of the stepmother, in Roman Catholic schools, and that they were being brought up as Roman Catholics in all respects.

Mr. Flynn, who was a railroad brakeman, seems to have made no will and left no property except life insurance for his widow's benefit. At or immediately after the funeral services at Mr. Flynn's grave, the infant Walter J. Flynn, who is the subject of this contest, was carried off by the respondents without the knowledge or consent of the petitioner. When she turned from the grave she found that one of her children had disappeared.

It may be added that prior to the marriage Mr. Flynn had supported his children in different places, and the child Walter had been placed as a boarder with his aunt, Mrs. Clancy, one of the respondents. The Clancys, who are Roman Catholics, have no child of their own, but have an adopted daughter about ten or twelve years of age. The little boy Walter exhibits affectionate regard for his aunt as well as for his stepmother. Both of the parties litigating for the custody of this child are entirely respectable and competent to give the child the care and education and chance in life which a son of Mr. Flynn would be naturally expected to receive. Mr. Clancy is a motorman and has some substantial equity in the house in which he lives, but a comparison of the respective faculties of the two parties, and also of the conditions which make for the well being of this child in the two homes, is somewhat favorable to the petitioner.

3. Each of these parties has made an effort so far unsuccessful to procure the legal adoption of this child. So far as appears in the case no application has been made by either party to the surrogate or orphans court of Hudson county for the appointment of a guardian. We have presented here the somewhat unusual case of a contest over the custody of an infant of tender years where no right of a parent or a guardian is involved.

In the case of *Violet Nevin* (1891), 2 Ch. 299, substantially the same state of facts was presented to the court, but the application was for the appointment of guardians and for directions in regard to the religious education of the infant. Lord Lindley stated (at *p. 309*) that the case was "peculiar in this, that there was no father, no mother, no guardian, no direction by the father as to the religious education of the child." In the case now before this court we have the same situation, except that there is not and could not be any question of general guardianship presented to the consideration of the court of chancery of New Jersey. What is before the court is an award of custody in recognition of the right of a parent or person standing *in loco parentis* to an infant child of tender years, or the denial of such award from considerations relating to the welfare and best interests of the infant or the presumed wishes of his deceased parents.

It is well settled that a stepfather or a stepmother as such has no right to the custody of a stepchild.

It is also settled that persons standing *in loco parentis* to an infant have a right of custody as against strangers. *29 Cyc. 1621*, and cases cited; *Richards* v. *Collins, supra,* 286, 287; *In re Williams* (*Vice-Chancellor Howell, 1910*), 77 N. J. Eq. 478, 481.

In *Richards* v. *Collins,* Mr. Justice Knapp, in delivering the opinion of the court of errors and appeals, stated:

"Doubtless it is the strict legal right of parents and those standing *in loco parentis* to have the custody of their infant children as against strangers. This right will control the judgment of the court unless circumstances of weight and importance connected with the welfare of the child exist to overbear such strict legal right."

Only a parent or guardian can establish a superior right of custody and take the infant from the actual custodian who in fact stands *in loco parentis.* Step-parents, uncles, aunts and other collateral relatives have no right as such relatives to take the custody of an infant from the person standing *in loco parentis.* If they wish to acquire a superior right of custody they must get an appointment as general guardian of person and property, which appointment the court of chancery of New Jersey cannot make. The guardian takes the custody from the step-parent who has stood *in loco parentis* perhaps continuously from the birth of the child, where no question of unfitness arises.

*In re Camella Grielo (1893), 17 N. J. L. J. 11.* In this case it must be noted that Mr. Justice Depue was exercising the ordinary jurisdiction of a law judge on *habeas corpus,* and could not exercise the jurisdiction of the chancellor as *parens patriœ.*

The propositions stated above, of course, are general rules or principles which are subject to exceptions and modifications in particular cases, as, for instance, where the parent or guardian has abandoned or waived his right to custody, or when such right is made subject to considerations relating to the welfare of the infant.

In the case at bar, the father upon his marriage to the petitioner took the infant from the home of Mrs. Clancy and placed him under the care and control of his wife, the petitioner, and he must have known that the relation of mother and child would be established, and must have seen that such relation in fact was established between the petitioner and this infant. The father, apparently with abundant opportunity to make a will, and slowly approaching death, died without appointing any guardian and thus left the petitioner, his widow, as the sole custodian of this child, holding the rights and discharging the duties of its mother. Upon Mr. Flynn's death the petitioner, as stepmother, as we have seen, acquired no right of custody, but she stood firmly *in loco parentis,* in which place her deceased husband, the father of the child, had placed her. So far there does not, in my opinion, appear to be a shadow of support to the

right to the custody of this infant which his aunt, Mrs. Clancy, sets up against the petitioner and endeavored to enforce by a clandestine seizure.

4. The question now arises whether the welfare of this child, or any rule of law, makes it the duty of the chancellor as *parens patriæ* to take the custody of this child from the petitioner who otherwise is entitled to such custody, and award the same to this stranger, the infant's aunt, in order to secure the infant's education in the Roman Catholic religion. No English or American authority has been cited, and I have found none which sustains such a proposition. English cases which bear upon the matter in hand, and which I think are all later than the settlement of this country, the establishment of the New Jersey court of chancery, and even later than the Declaration of Independence, indicate more or less distinctly that if this cause were before an English court of chancery the custody of the infant might be awarded to the petitioner, while an order would be made that the child be brought up in the Roman Catholic faith. Whether the English court would exercise any such power except as an incident to the appointment of a guardian, is a question which I have not undertaken to investigate.

5. The English rule is settled "that, except under special circumstances, the child must be brought up in the father's religion." *Simp. L. Inf. (2d ed.) 129; Talbot v. Schrewsbury, 4 My. & Cr. 672; Hawksworth v. Hawksworth (1871), 6 Ch. App. 539; In re Violet Nevin, supra.* In the lifetime of the father, he has the absolute right to determine the religious education of his children. *In re Agar-Ellis, 10 Ch. Div. 49; In re Scanlan, 40 Ch. Div. 200, 207.*

In the *Hawksworth Case* a Roman Catholic died leaving a widow who was a Protestant, and an infant daughter six months old. The daughter remained with her mother and was brought up as a Protestant until she was eight and a half years old. The court of appeal, affirming an order of Vice-Chancellor Wickens, directed that the child should be reared in the Catholic faith. Lord James (at *p. 542*) states the law of England as follows:

"The rule of the court is that the court, or any persons who have the guardianship of a child after the father's death, should have sacred regard to the religion of the father in dealing with the child; and, unless under very special circumstances, to see that the child is brought up in the religious faith of the father, whatever that religious faith may have been."

This statement of the law is quoted and approved by Lord Kay in the *Case of Clarke (1882), 21 Ch. Div. 817, 823, 824.*

Whether much or little of the modern English law pertaining to the religious education of infants has been or will be adopted in America or in New Jersey, we may remark in passing that the superior right of the father to the mother with respect to this matter, would probably be recognized, if at all, in a greatly modified form. In New Jersey we have gradually evolved the legal proposition that

"in making an order or decree relative to the custody of the children pending a controversy between their parents, or in regard to their final possession, the rights of both parents in the absence of misconduct, shall be held to be equal, and the happiness and welfare of the children shall determine the custody or possession." *P. L. p. 1902; 2 Comp. Stat. p. 2810 § 21.*

Strictly speaking, it is not an arbitrary rule favoring the father's religion which the English court lays down. It is the father's wish or presumed wish with respect to the religious education of his children which the English court enforces. When the rights of the parents in respect of custody are made absolutely equal before the law, there is some difficulty in adopting the English rule which gives the deceased father's wish with respect to the religious education of his child greater force and effect than the wish of the surviving mother. In several of the English cases the judges have enforced the rule in favor of the father's religion, fully recognizing the force of the views expressed by Vice-Chancellor Wickens (*Hawksworth* v. *Hawksworth, supra, 541 N*), to the effect that the result may be to "create a barrier between a widowed mother and her only child;" to annul "the mother's influence on her daughter on the most important of all subjects, with the almost inevitable effect of weakening it on all others; to introduce a disturbing element

into a union which ought to be as close, as warm and as absolute as any known to man; and, lastly, to inflict severe pain on both mother and child." In this *Hawksworth Case,* on appeal, Lord Mellish (at *p. 545*) plainly admits the force of the view expressed by Vice-Chancellor Wickens, but states that the court could not alter a rule of law which prefers the religion of the father to that of the mother.

Mr. Simpson remarks (at *p. 131*) that if both parents are dead the English rule

"may be a fitting one, but it seems a strange extension of the father's rights when he is in his grave, to allow even his expressed wishes in such a case, and still more, his merely presumed wishes, to override rights of the living parent."

It appears that the priority of the religion of the father or of his actual or presumed wish in respect of the religious education of his child, is recognized under the English Poor Law acts, which provide that the child "must be educated in the religion of its deceased father." *Simp. 131.* As indicating a different view of the relative rights of the dead father and the living mother with respect to the religious education of the child, it may be noted that in the act creating a state board of children's guardians the legislature of New Jersey makes it the duty of the board to place children who come within the provisions of the act in the "care of some family of the religious faith of the *parent or parents* of such child." Whether, in view of our present law equalizing the rights of father and mother with respect to custody above quoted, the board of children's guardians under this statute could lawfully prefer the religion of one spouse to that of the other, may well be questioned.

A recent American text-writer, after recognizing the doctrine of the English court of chancery, that "ordinarily children should be brought up in the faith of their father, and that orders may be passed to that effect," states that

"the American doctrine is that the courts have no jurisdiction in the matter of religious education and training, and that no one should be subjected to any disability for his profession of any particular form of religion." *Hoch. Cus. of Infs. (3d ed.) 1899 p. 31 § 31.*

This same writer, however, proceeds to say that "in the selection of a guardian care should be exercised, whenever practicable," to guard against estrangement from the paternal faith.

In *21 Am. & Eng. Encycl. L. (2d ed.) 1057*, the priority of the father's religion to that of the mother under the English rule is recognized, and the author states that "in the United States this question seems not to have been considered." See *Purinton* v. *Jamrock, 195 Mass. 187, 195, 196, 199, 200.*

We are not obliged in this case to deal with any of the unsolved problems which may yet arise in regard to the respective rights of a father and a mother pertaining to the religious education of their children, where the father and mother are of different faiths, or have different and conflicting schemes for such religious education, because both parents of the child before the court in this case were Roman Catholics. Both, undoubtedly, united in having their children baptized and educated as Roman Catholics.

6. The question to the consideration of which practically all the foregoing discussion has been leading, is whether the chancellor of New Jersey in the exercise of his jurisdiction as *parens patriæ* in a *habeas corpus* case, which brings before him an infant of tender years, will award the custody of the infant, and then, following the English precedents, in proceedings for the appointment of guardians, make an order directing in what religious faith the infant must be brought up. I find no authority in New Jersey, or elsewhere in the United States, sustaining the exercise of such a power. The whole trend of the American decisions, so far as we have any on the subject, seems to limit the cognizance which the courts may take of the religion of parents to the function of appointing guardians and awarding the custody of infants. In the English cases which I have examined the court of chancery made its orders in regard to the religious education of the infant in a proceeding which included the appointment or removal of a guardian—a jurisdiction which this court does not possess. The authorities cited above—*Baird* v. *Torrey* and *Richard* v. *Collins*—indicate that perhaps the chancellor of New Jersey on a *habeas corpus* where the jurisdiction over the custody of infants as *parens patriæ* is invoked, may

make orders corresponding with those which the English court makes as incidental to its power to appoint, remove and give directions to a general guardian. This matter I do not feel obliged at present to consider or decide.

I have not found any reported New Jersey case which goes beyond *In re Turner, 19 N. J. Eq. 434,* in taking cognizance of these considerations pertaining to the religious education of infants which are recognized and enforced in the English chancery courts, and which have resulted in the development by those courts of what is almost a code of binding rules. In the *Turner Case* the ordinary (Zabriskie, 1868) in deciding a contested application for the appointment of a guardian of an infant said (at *p. 435*): "The religious training of the child, so far as regards the sect or denomination under the influence of which that training shall take place, is entitled to consideration. * * * Parents while living have a right to control the religious education of their children, and their wishes in this respect must be regarded after their death. Where both parents were of the same religious faith, and die without expressing any wish on this subject, the courts will presume that they wished their children educated in their own faith."

The ordinary does not hold that the factor in the case which he held to be "entitled to consideration" was controlling or would prevail against the interests of the infant.

In the case of *Annie Cunningham, supra,* the father of the infant was a Roman Catholic, and the mother a Protestant. The infant, a girl sixteen years of age, with the consent of the mother, was placed in a Roman Catholic institution, the House of the Good Shepherd. Vice-Chancellor Stevens, in awarding the custody of the girl to the institution, did not have occasion to refer to the fact that the retention of custody by the institution secured the education of the infant in the religion of her father, but placed his decision upon other grounds.

After the case at bar had been argued and submitted, counsel for the respondents applied without affidavits to have the case opened and some proof presented that the petitioner was proselytizing the infant, or, at any rate, influencing him in favor of Protestant forms of worship. The proof as described was, in

my judgment, of doubtful force, but I should have allowed the matter to be more fully investigated if I had not already concluded in my mind that, if the custody of the infant was to be awarded to the petitioner, an ample reservation would be made in the order in the form or to the effect hereinafter described.

As the proofs stand there is no evidence that the petitioner is not recognizing what I think a great many right-minded persons, whose judgment is not biased by their particular form of religion, would regard as a moral duty of binding obligation upon the petitioner's conscience, viz., to continue the religious education of this child in the faith of its parents, notwithstanding the necessary evils or inconveniences which may arise from such a course and mar the intercourse between the child and the woman who is now in effect his mother, and to some extent weaken the mother's influence for good which she no doubt has exercised, and will exercise. If the respondents wish to charge the petitioner with proselytizing, or in any substantial degree interfering with the religious education of this child in the Roman Catholic faith, I think that they should present the matter in a definite form in a pleading to which the respondents may make reply. There will thus be stated on the record the novel and difficult question whether the chancellor of New Jersey as *parens patriæ* can in this case make an order, corresponding with the orders above mentioned, frequently made by the English court of chancery, directing this infant in the custody of a person of one religious faith to be brought up by her in another religious faith. In view of the absence of authority, or even discussion of this novel question in the courts of New Jersey, it seems to be quite plain that it is my duty to undertake the decision of it only when I am obliged to do so. When the question comes up, if it does come up, the court of chancery must decide whether it will take this step in advance, which is perhaps against the trend of American decisions, or leave such development of our law, if it is to be made at all, to be made by the court of errors and appeals.

My conclusion is that the order of the court to be made now in this case will award the custody of the infant to the petitioner from which custody the infant was wrongfully taken by the re-

spondents, or one of them. The order, however, will not necessarily be a final award of custody. There will be an ample reservation (*Richards* v. *Collins, supra, 289.*) under which the defendants may apply by petition verified by affidavits showing that the petitioner is proselytizing the infant, or, in other words, that the petitioner is not continuing the education of the child in the Roman Catholic faith. Upon such a petition the questions will arise whether the petitioner in fact is or is not educating the infant in the Roman Catholic faith, and if she is not, whether the court should make an order directing the religious education of the child, or amend the order for custody now to be made by inserting a condition which will secure the same result, viz., the education of the infant as a Roman Catholic while he is with his present custodian or the vacation of the award of custody.