The prerogative of the Chancellor as parens patriae to govern the custody of an infant is invoked by the writ of habeascorpus, the return and the scope of the proofs in the present proceeding. State, Baird v. Baird, 19 N.J. Eq. 481, 486. To render an advisory opinion to the Chancellor in such a controversy, the natural and legal rights of the parent must, of course, be contemplated, but the subject of paramount consideration undoubtedly is the welfare of the child. Richards
v. Collins, 45 N.J. Eq. 283; 17 Atl. Rep. 831; In re A.B.M.,132 N.J. Eq. 434; 28 Atl. Rep. 2d 518.
Here, the mother, a resident of the City of New York, seeks to obtain the custody of her female child. A summary of the salient facts will suffice to disclose the considerations upon which the decision rests.
The inference is inescapable that the petitioner has not heretofore been scrupulous in her social behavior. She has *Page 272 
in the past been committed to reformatory institutions in the States of New York and New Jersey. She has been twice married. Singularly, the name of her first husband, with whom she cohabited for about a year, she could not immediately recall. After some period of cogitation, she entertained the vague impression that his Christian name was "Tony." When asked the name of the man with whom she next cohabited, she replied, "I wasn't exactly living with anybody." The former marriage was dissolved. She has not seen her second husband during the past five years. On October 20th, 1944, she gave birth to a daughter whose custody is implicated in the present proceeding. The putative father whom she met at intervals of six or seven months has never seen the child. He is said to be engaged in the merchant marine.
A few weeks after her confinement the petitioner entrusted the care of her baby to her sister, Mrs. A., who with husband and family resides in Trenton and, during the summer months, in Atlantic City. It is fair to infer that the petitioner on that occasion surrendered her child because of ill health and lack of assistance. A few weeks later the petitioner undertook to resume the care of the child, but after the lapse of about ten days she evidently appreciated that in her situation she could not pursue her daily employment and provide adequate solicitude for an infant so immature. She resolved to again commit the child to the custody of her sister. Moreover, she united in the proposal that her sister and brother-in-law, Mr. and Mrs. A., legally adopt the child, and in furtherance of that plan the petitioner on January 25th, 1945, executed and acknowledged in writing her formal consent to the proposed adoption. Her letter addressed to her sister on February 3d 1945, also manifested her acquiescence. The adoption proceedings were however interrupted in consequence of the subsequent protest of the petitioner, and the petition inaugurating the present cause was filed on May 29th, 1945.
The respondents, imbued with the settled conviction that the petitioner is irresponsible, have in their view of the welfare of the child declined to relinquish their present custody *Page 273 
without some authoritative adjudication. It may be of some incidental significance to divulge that the solicitors, with the co-operation of the Vice-Chancellor, have earnestly endeavored to evolve some arrangement conducive to the well-being of the infant and mutually agreeable to the parties. Hearings have been continued in the endeavor to ascertain the interest, if any, of the putative father in the future of the child and to afford him an opportunity to personally appear. The petitioner has evidently been unable to have him attend a hearing or to otherwise supply any helpful assurances. That has been an obstacle in the attempts to conciliate.
The evidence does not convince me that the petitioner has evinced a willful and culpable intention to abandon her child, nor are her parental rights diminished by the circumstance that the child was born out of wedlock. R.S. 9:16-1; N.J.S.A. 9:16-1;Hesselman v. Haas, 71 N.J. Eq. 689; 64 Atl. Rep. 165. The decision is not constructed upon those substructures.
In the present event, the problems are whether the petitioner is suited by character, reliable and trustworthy qualities, circumstances and surrounding conditions to assume at once the sacrificial duties essential to the maintenance and proper guardianship of this infant, and whether to award the immediate and exclusive custody of the child to the petitioner will be conducive or adverse to the general welfare of the infant. Hence the respective situations of the parties must be discriminately appraised. The petitioner has dwelling accommodations in an apartment in New York City. A brother of the putative father, a Mr. H, resides at the same address. The petitioner is there known as Mrs. H. It is not ostensible that the putative father was ever domiciled there. The petitioner is regularly employed at a factory of the Western Electric Company during six and sometimes seven days each week. Formerly she worked on Mondays, Tuesdays and Thursdays from 4:30 P.M. until 3:00 A.M., and on Wednesdays, Fridays and Saturdays until 1:00 A.M. I understand that she is now engaged in her employment during the day from early morning until 4:30 P.M. Her original representation was that she had made arrangements *Page 274 
for her mother to depart from her established home at Trenton and to betake herself to the supervision of the child in New York City. It was revealed that the petitioner's mother is sixty-eight years of age and unable to customarily use the English language. Although she has been present at the hearings, she has never personally expressed her disposition to indulge in any such benevolent undertaking. At the last session, the petitioner imparted a revised expectation that a Mrs. O'Hara, who resides in the neighborhood, would lend her attention to the child during the hours of the petitioner's employment at the factory. No verification of that anticipation has been even faintly effused by the Mrs. O'Hara.
Behind the curtain of pretense, the petitioner is assuredly conscious of her inability to personally administer to the needs of her child without assistance. The availability to her of the requisite aid is not now probable.
A comparative and contrastive survey of the opportunities of the child in the alternative environments is imperative. This baby came to the respondents noticeably undernourished and suffering from some deformity of the shoulder and arm. Indubitably Mrs. A. rescued the child. She enlisted the services of an orthopedic expert, and tirelessly transported the child to the hospital for clinical treatments. She purchased and applied the correctional appliances. The child was nurtured to a gratifying state of normality. Mrs. A. is the mother of four children between the ages of eleven and sixteen. Her daughter Phyllis has constantly displayed a maternal affection and tenderness toward the baby. When asked as a witness if she loved the child, no one present could doubt the profound sincerity of her answer: "Oh, yes, I do." Others have observed the considerate devotion of Mrs A. and her daughters to the care and comfort of the child. Indeed, the petitioner despite her present state of resentment has no doubt that her child is now receiving faithful attention. Some incertitude concerning the petitioner's motives stems from her answer to the following question: "When did you first decide to take back your baby?" Answer: "I realized that I wanted my baby back for no reason at all." Has she in mind some serviceable materialistic purpose? However *Page 275 
wholesome her desire to possess her child, it remains purely specious to suppose that in the light of her past behavior and in her existing circumstances she would be as efficient and devoted a custodian of this dependent child as the respondents. Any indecision on that point was dispelled by Mrs. Tilton, whose personal knowledge of the facts, manifest intelligence, and impartiality infused her testimony with both logic and persuasion.
A child cannot be regarded in the law as a mere inanimate chattel. The rights of the parent must not be permitted to obliterate the rights of the child. However inauspicious the birth, every child should be afforded a favorable chance to face the future. When it is evident that a mother cannot adequately and properly provide for the personal safety, morals, health, and comfort of her illegitimate child, the present and future interests of the child must be accorded pre-eminent respect. In the present case the custody of this child is not to be awarded to the respondents because of their legal right to it, but because in the circumstances the Chancellor should not "substitute a worse for a better custodian." It is in this spirit that the technical character of this proceeding has been ignored, and it has been regarded as an appeal to the Chancellor as the representative guardian of all infants.
The application that the child be delivered to the petitioner is denied, and an order will be advised committing the child, R.P.H., to the continued custody of the respondents. The order should embody terms affording the petitioner reasonable and convenient opportunities of access to her child, and reserving for her the privilege of presenting another application at some future time if and only when a material change in her conditions has occurred. *Page 276