[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 236 
This is a contest over the custody of a six-year old boy whose parents are separated from each other. The Chancery Division gave custody to the mother, and the father appeals.
A preliminary motion will first be disposed of. Although this is an appeal from a final judgment founded on the testimony of witnesses who were examined in the presence of the Court, the respondent has printed in her Appendix ex parte affidavits filed at an early stage of the litigation on a motion for interlocutory relief. The appellant moves to expunge the affidavits from the Appendix. While ex parte affidavits may properly be used on interlocutory applications, they cannot be the basis of a final judgment except by consent, express or implied. Test v. Test,131 N.J. Eq. 197 (E. A. 1942); Isserman v. Isserman,138 N.J. Eq. 140 (E. A. 1946). The parties to a cause are entitled to be present when witnesses testify and to cross examine them. In the present cause, there was no consent to the use of the affidavits on the final hearing and the learned trial judge does not seem to have based his conclusions on them. Obviously, it would be improper for us to use the affidavits on the appeal from the judgment and therefore they should not have been printed in the Appendix. The appellant's motion to expunge is granted.
The parties have three children, Arthur, born October 7, 1942; Pauline, born in 1946; and Russell, in 1947. Mr. and Mrs. Seitz came to Bernardsville in the fall of 1946 to make their home in what had been the caretaker's cottage on the estate of his parents. After they had lived there together for fourteen months, Mrs. Seitz left, taking with her the youngest baby, and returned to her mother's home at Deal. Ten days later, Seitz started the present proceeding with a petition for divorce which included a prayer for custody of the children. In March, 1948, the custody of all three was committed to Mrs. Seitz pending the final hearing of the cause. Since then, they have been living with their mother, except that Arthur, on *Page 238 
alternate week-ends and for seventeen days, June 25 to July 12, has been with his father. The cause came to a final hearing November 12, 1948, at which time, and before any proofs were taken, Seitz abandoned his prayer for divorce and for custody of the two younger infants and accordingly the hearing was confined to the question of the custody of Arthur, who was then six years old.
It seems necessary to state the substance of the testimony. Dr. Bagg, a general practitioner of medicine, was called early in 1947 to see Pauline, who was ill. The doctor found the house in a shockingly filthy condition. There was dirt on the stairway; beds were unmade; and cigarette butts were all over. A marked odor came from the clothes hamper which was overloaded with soiled diapers. On the kitchen stove were the remains of uncooked or partly cooked food. The doctor looked into the ice box to determine under what conditions the babies' milk was kept; he found bottles uncapped and half full, and one bottle with its nipple on lay on the floor. The following June, Dr. Bagg called again and found the child with the same ailments and the house in the same condition.
When Mrs. Seitz came for Arthur in March, 1948, he started sobbing and shouting he would not go with her; he kicked and scratched until finally she handed him over to a police officer whom she had brought with her.
The appellant presented three psychiatrists, and the respondent, two, who had examined Arthur at sundry times between June, 1948, and the hearing in November. They found the boy well developed and intelligent, but very nervous and restless. He was subject to a number of mental conflicts and was badly adjusted to his situation. The child was developing neurotic tendencies and his thinking processes were even becoming pathological. He showed a preference for his father, a marked dislike for his mother, and a hatred for his maternal grandmother, Mrs. Hayes. Dr. Spradley, one of appellant's pathologists, saw Arthur on July 12 when he had been with his father for two weeks. The doctor observed what he thought to be a very definite improvement in the child's emotional and nervous reactions, as compared to his condition in June. But *Page 239 
the next fall, after the boy had spent the summer with his mother, all improvement had disappeared. The five doctors agreed that it was bad for the boy to be subjected to the influence first of one parent and then the other. None of them recommended that he remain in his mother's custody. One group advised that he be put in the care of his father, while the others recommended that he be placed in a "neutral environment" such as a school, where he could receive psychiatric treatment for at least a year, and that, at the end of that time, he be re-examined to determine future disposition. Dr. Ford, called by respondent, said: "When he begins to adjust his ideas, I would start visitation by the mother with short visits at intervals. Later on, short visits from the father, and in about a year's time, attempt to determine the boy's progress and the effects of the contacts of one parent and the other."
Arthur was in a school for small children in Bernardsville until his mother took him to Deal in March, 1948, and he did very well there. His reports showed that he "plays nicely with the other children, although he is one of the youngest in the group." Mrs. Seitz put the little boy in the school of Miss Youmans from April until the end of the spring term and then again in the fall. But in the fall, after three weeks, Miss Youmans was unwilling to keep him longer. She thought he was in no physical condition to be in school, and he had become a problem on the playground. He did not play well with the other children. He seemed unhappy, and usually there was something disturbing him.
Such in summary were the proofs. There were much to indicate that the child would be better off and happier with his father than with his mother and no evidence at all to the contrary. While the learned judge of the Chancery Division did not file an opinion giving the reasons that led to the judgment, his reasons may be gathered from his remarks during the course of the hearing. He noted that it is the policy of our law to award custody of children of tender years to the mother, and said that Mrs. Seitz would be given custody of Arthur unless it were proved that she is "an awfully bad woman, morally depraved, absolutely unfit." In our opinion, this view of the *Page 240 
law cannot be supported. Neither father nor mother has a greater right than the other to the custody of their child, and in a contest between them, the happiness and welfare of the child is the determining factor. R.S. 9:2-4. Richards v. Collins,45 N.J. Eq. 284 (E. A. 1889); Lippincott v. Lippincott,97 N.J. Eq. 517 (E. A. 1925); In re R.L., 137 N.J. Eq. 271(Jayne, V.C., 1945). Children of tender years are not awarded to the mother because of any rule of law, but only because in fact the mother will usually take better and more expert care of a small child than can the father. But the problem in every case is the same, What will promote the happiness and welfare of the child?
Again, the learned judge indicated that inasmuch as custody had been awared the mother pendente lite, the father must show a change in the situation since the date of that award, else the custody of the mother should be continued. We do not concur. Interlocutory orders designed to preserve the status quo or to establish a modus vivendi pending a full inquiry at the trial, do not prejudice the rights of the parties. The court's power and duty to make such disposition of the case as the proofs taken at the trial may show will be beneficial to the infant, remains uncurtailed.
The trial court, in harmony with its view that the issues were whether there had been a change in the situation since the order for custody pendente lite and whether the mother was a bad woman, refused, after Dr. Bagg had testified, to receive more evidence of happenings antedating the suit, and also shut out proofs offered to show what would best advance the welfare and happiness of the child, but which did not touch the character of the mother. From what we have already said, it follows that the exclusion of such testimony was erroneous.
The court limited the psychiatrists too closely in respect to statements made by the boy while they were examining him. Their diagnosis of the condition of his mind and nervous system, their recommendation for his future treatment, were based principally on his manner and on the words he uttered. As evidence of the child's mental reactions and to enable the court to evaluate the experts' opinions, the child's statements *Page 241 
were admissible whether brought out on direct or cross examination, and without regard to the truth or falsity of what he said. Wigmore, Evidence (1923), sec. 1720. Whether the doctor's recital of the child's statement — by exception to the hearsay rule — was evidential of the facts narrated by the boy, is a different question, and one which is not now before us. But the answer is probably in the negative. State v. Gruich,96 N.J.L. 202 (E. A. 1921); Friedman v. Essex Chair Co.,135 N.J.L. 512 (E. A. 1947).
It was a wholesome practice of the Court of Chancery when evidence of doubtful admissibility was offered, to defer a definite ruling on the offer and to receive the testimony unless this course would prolong the hearing unduly. The trial court was then in a position to use or to disregard the testimony as further study led to the conclusion that the evidence was competent and material, or the reverse. The procedure indicated by Rule 3:43-2 is proper under a slightly different situation, namely, where the trial court forthwith sustains an objection to the proffered evidence. The trial court, in the present instance, might well have followed one or the other of these courses.
At the conclusion of the appellant's case, the court announced that the child would be left in the custody of his mother, and therefore the respondent did not offer any evidence except the testimony of the two psychiatrists which had been taken, out of turn, before the appellant rested.
The proofs fail to support the judgment and so it will be set aside, with directions that the case be reheard on the proofs already taken and such new evidence as may be offered and received. Our concern for the welfare of the boy has led us to consider whether he should not now be sent to his father to be kept by him until the hearing. What have been the developments since the psychiatrists saw Arthur in October? Is he happy living with his mother? Is he well? Has he returned to school? Unless the Chancery Division calendar permits the matter to be tried within a very few weeks, the father should have leave to apply on notice for custody pending the hearing, and a disinterested report should be made to the Chancery Division, showing the present situation. *Page 242