29 N.J. Super. 317 (1954)
102 A.2d 656
SARAH SCANLON, PLAINTIFF-APPELLANT,
v.
FRANK L. SCANLON, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 11, 1954.
Decided January 21, 1954.
*319 Before Judges JAYNE, FRANCIS and CLAPP.
Mr. Solomon Golat argued the cause for appellant (Messrs. Talisman & Golat, attorneys).
Mr. Leslie H. Cohen argued the cause for respondent (Mr. Frank S. Sauer, attorney; Mr. Joseph A. Fuerstman, on the brief).
The opinion of the court was delivered by JAYNE, S.J.A.D.
This appeal conveys to us for appellate review the legal and factual propriety of the judgment nisi which in the conventional form dissolves the marriage of the parties in consequence of the willful, continued and obstinate desertion committed by the plaintiff as alleged in the amended counterclaim of the defendant, and prescribes the custody of the infant daughter born of the marriage.
The unreported memorandum of conclusions composed by Judge Goldmann in the Chancery Division is communicative of the nature of the action, the issues projected by the pleadings, and of his findings of facts. It is literally informational and expedient to reproduce it:
"Plaintiff wife instituted this action for separate maintenance and custody, alleging that defendant abandoned her on April 30, 1950, ever since which time he has refused and neglected to maintain and provide for her and Ellen, the child of the marriage. Defendant denies the *320 abandonment and counterclaims for custody of the child, alleging that it was plaintiff who abandoned and deserted him and the child on April 30, 1950, without justification, and continues to do so. He charges that plaintiff is morally and mentally unfit, and financially unable, to be entrusted with the care, custody, education and welfare to the daughter.
At the beginning of the hearing Advisory Master Hillenbach permitted both the complaint and the counterclaim to be amended so that each party sought divorce on the ground of desertion, and custody of the child. The amended pleadings have not been filed. For completeness of the record this should be done at once.
The parties first met during the summer of 1940 when they were vacationing at the Nature Friends of America Camp at Midvale, N.J. Defendant claims this camp was operated under Communist auspices. The parties went through a civil marriage ceremony in New York City on November 16, 1940. After living in Newark for a year they moved to 204 Berkeley Avenue, Bloomfield, where defendant still resides and where plaintiff lived until she entered Essex County Overbrook Hospital in January 1950, under circumstances about to be detailed.
The court has had the benefit of the transcript of testimony taken before Advisory Master Hillenbach, as well as the continuation of testimony taken on February 26, 1953. It also has the report of investigation made by the Essex County Probation Office pursuant to Rule 3:87-12(c). This report was made available to both counsel who were given the opportunity to cross-examine the investigator, Mary F. Scanlon, who made the report. Also before the court is the file of the Essex County Overbrook Hospital admitted in evidence.
Plaintiff and her elder brother Samuel came to America in 1921 to live with relatives in Connecticut, leaving their orthodox Jewish parents behind in Lithuania. Later plaintiff went to Boston to live with her brother Samuel, now married. She became a citizen in 1929 and moved to New York about 1936 after being twice arrested and jailed for anti-Hitler demonstrations in 1933. She has had practically no connection with her religion.
Defendant was brought up in the Catholic religion, but failed to adhere to it from the 1920's down to about five years ago, when he resumed church attendance. He claims to have been regular in his Catholic duties for the past year or two.
Defendant frankly admits that he was a member of the Communist Party at the close of the 1930's and sought and obtained admission as a member when he married plaintiff. He charges that plaintiff continues to be a member of the party. Plaintiff testified that she has not been a member of the party for the past ten years. A 1946 membership card issued by the Communist Party of the U.S.A. belies that statement.
Ellen, daughter of the marriage, was born July 22, 1942. A few years later the mother began to suffer manic-depressive symptoms. As her condition worsened, she became less and less able to care for herself, her home and the child. The Bloomfield apartment was *321 in disorder and dirty. The child was unkempt and badly cared for, her play habits with children of her age were not normal; the child was overwrought and her life lacked discipline and order.
The father was. by his own admission, a heavy drinker for many years, although he somehow was able to attend to his shipping clerk and warehouseman duties at the local Chevrolet plant. His work record there over the past 18 years has been good.
In August 1947 plaintiff voluntarily committed herself as a patient to Essex County Overbrook Hospital where she underwent shock therapy treatments. She left the institution in October 1947. Ellen, in the meantime, was cared for by the paternal grandparents.
Plaintiff's mental condition improved only temporarily as a result of the Overbrook treatments. She began to suffer moods of depression in the summer of 1948. Her depression deepened and in March 1949, when she was contemplating return to the hospital for further treatment, she tried to make arrangements for the care of her child. She consulted the Associated Catholic Charities in Newark for Ellen's placement. On March 28, 1949 she voluntarily had the child baptized in the Roman Catholic faith, and on the next day placed her in St. Joseph's Home, Jersey City. The child was discharged into the care of the mother on July 7, 1949, on the representation that she wanted to take Ellen to Chelsea, Mass. to visit with her relatives. On the witness stand, plaintiff persisted in stating that she did take the child to Massachusetts. However, the proofs are directly to the contrary. There were introduced in evidence bills showing that plaintiff and the child stayed at the Midvale Camp, Midvale, N.J., from July 8 to at least July 18, 1949.
On January 5, 1950 plaintiff again decided voluntarily to reenter the Overbrook Hospital. She was admitted there the next day. Defendant brought the child to the Associated Catholic Charities on January 7, 1950, and she was then placed in St. Anthony's Orphanage, Arlington, N.J., where she has since remained. During her stay there the child has made excellent progress. She is neat, clean and polite. Her table manners are correct. She knows how to play with children again. Her progress in the primary grades has been excellent. The child is still somewhat below normal physically.
After almost four months of treatment, plaintiff was allowed to leave Overbrook on April 30, 1950. (She was discharged from care by unanimous vote of the staff on May 25, 1951.) On leaving Overbrook, plaintiff was `signed out' by her cousin, Mrs. Moskowitz, of Staten Island. After staying with her for some three weeks, she then visited her relatives in Connecticut, returned to Mrs. Moskowitz for a week, then moved in with a Mrs. Fay Peters in a veterans' housing project in Paterson, where she lived from July 6, 1950 to October 1951, then moved to a one-room apartment on Fair Street, Paterson, moved again to Mt. Pleasant Avenue, Newark, and now resides on Summer Street, Paterson. She is steadily employed and has lost no time from work. A skilled machine operator *322 in a plant which turns out women's pajamas, she earns $55 to $73 a week.
Plaintiff's charge that defendant deserted her is supported by her testimony only. It is not corroborated. Defendant testified that when he called at the hospital to take her back home, he found that she had been discharged in the care of Mrs. Moskowitz. He had visited her at the hospital a few times, and claims that he would have visited her oftener except that she preferred that he see Ellen at the orphanage on Sunday visiting days rather than visit with her, the hospital visiting days also being Sunday. Defendant testified that plaintiff came to the apartment a few days after leaving the hospital and that he tried to get her to resume the marital arrangement. Instead, she picked up some clothes and left. Two weeks later she came again and was again asked by defendant to stay. She took more clothes and left. There was a third visit when she wanted to take a number of things with her which defendant claimed were not hers. Her testimony was that he threatened to call the police; he states that he was going to phone the police for advice, but instead phoned his attorney. He was ready to take her back, and defendant's father, who was present, spoke to her about trying to reconstitute the home. She left.
Defendant's testimony is corroborated by his elderly father, who was present on two of the occasions when plaintiff called at the apartment. The first time he saw defendant put his arm around plaintiff's shoulder and ask her why they could not get together again, to which she replied `Impossible.' Some months later she was there to get her belongings and the father testifies that defendant again requested her to come back and make a home for themselves and the child. The father himself sought to persuade her, and her only answer was `No, no.' Charles H. Hustler, who lives with defendant, recalls that when plaintiff was at the apartment her husband asked her several times about living together but that plaintiff was not communicative and was terse in her answers.
Plaintiff herself testified to going to the apartment twice to get her eyeglasses and clothes and admits that she did not say to her husband that she wanted to resume married life, but that he did not ask either.
On the balance of the testimony, and after observing the witnesses and their demeanor on the stand, I am satisfied that the plaintiff deserted defendant. There are indications in the record that she may have been advised by those who treated her condition that resumption of marital life was not good for her. I conclude that her desertion was not only obstinate and continued for the statutory period, but also wilful.
The difficult question in this case is disposition of the custody of the child. She likes both parents and enjoys their company. However, in a conference in chambers she told Advisory Master Hillenbach that she likes her father better because he is Catholic.
Defendant joined Alcoholics Anonymous about five years ago and has stopped drinking. His corroborating witness, Hustler, is also *323 an Alcoholics Anonymous. The defendant is a dependent person, mentally slow and emotionally unstable. He has only limited insight into the marital situation. He blames the breakup of the marriage on his wife's `ideological' views. However, the roots of the marital difficulties would appear to lie in the physical incompatibility of the parties going back to the beginning of the marriage and continuing during its course.
As for plaintiff, some time after her discharge from Overbrook her attending neuro-psychiatrist, Dr. Leon Ginsberg, wrote in reply to an inquiry made by her attorneys that although on leaving the hospital plaintiff was much improved, her judgment was poor, she had no understanding of her illness, and in the opinion of the hospital authorities she would not be able to bear the additional responsibility of taking care of her child. Note was taken of the fact that there had been three episodes of mental disturbance  a mild disturbance occurred before the first admission to the hospital  `and there is a great possibility that she will have future difficulties. She was discharged as recovered from her attack of depression, but since this is a recurrent illness, the prognosis for the future is somewhat uncertain.' Such was the opinion of Dr. Ginsberg on August 22, 1951. In reply to further inquiry, he wrote plaintiff's attorneys on December 27 that there was little that could be added to the previous report, and that Mrs. Scanlon `would not be able to bear the additional responsibilities of taking care of her child.' At the time of the first hearing on September 15, 1952, Dr. Ginsberg testified that plaintiff showed no evidence of psychoses. In his opinion, she was normal. However, he stated that manic depression `is a recurring disease for the most part. There is no way to state definitely whether another attack will come or won't come.' He would not say with certainty that plaintiff would not suffer future attacks. Any suicidal tendencies, such as she exhibited years ago, might include other persons as well as herself. He felt that plaintiff was stable enough `to offer much assurance that she would ask for medical attention and receive it,' if necessary. The prognosis `is fairly good.'
In reply to an inquiry as to what plans she had for the child should it be given into her custody, plaintiff stated that her first preference was to have her relatives in Chelsea, Mass, or in Torrington, Conn. care for her. If necessary, she would set up an apartment near her work and would see the child before sending her off to school and after work hours. Her preference was for a custodial arangement in Chelsea, Mass.
Asked about the child's religious training, plaintiff testified that she felt that `as long as there were different religions the child would grow up and make up her own mind.' She would rear the child in the principles of the Catholic faith, if the child wanted this.
The Essex County Probation Office case worker was of the opinion that it was questionable whether custody should be awarded to either party. After examining the Probation Office report of investigation, considering all the evidence and observing the parties themselves, the court is of the opinion that the child should be placed *324 in a good Catholic foster home by the Associated Catholic Charities of Newark, and that this agency should supervise the custody. The best interests of the parents and the child will be promoted by permitting regular visitation to the mother and the father once a week. It is suggested that Saturday be allowed to the mother and Sunday to the father. The child is not to be taken outside the community of its foster home residence unless attended by one of the foster parents. Defendant is to pay the costs of the foster home as well as all necessary medical and dental expenses for the child.
There will be a reasonable counsel fee allowed the attorney for plaintiff, to be fixed by the court.
Please submit judgment at once dismissing the complaint, granting the demand for judgment of divorce made in the counterclaim, and providing for the indicated custodial arrangement. The judgment nisi should also provide for quarter-annual reports to the court by the Associated Catholic Charities covering the status of the custodial arrangement and specifically the progress of the child."
In its application to the custody of the child, the judgment reads:
"And it is further ordered and adjudged that the custody of Ellen Rose Scanlon, infant child of said marriage, be and the same is hereby awarded to Associated Catholic Charities of the Archdiocese of Newark, and by it placed in a good Roman Catholic foster home, until the further order of this court."
In having due regard, as we should, for the opportunity of the trial judge to determine the credibility to be conferred upon the testimony of the witnesses, we conclude that the facts resolved by the trial judge from his consideration of the pertinent evidence sustain the granting of the divorce.
Manifestly the predominant pressure of the appellant's attack upon the judgment is concentrated upon the component relating to the custody of the child of the marriage. It is the insistence of the appellant that the judgment awarding the custody of the child to a Roman Catholic society in disregard of the objection of the mother, who is of the Jewish faith and who wished the child to be reared free of any sectarian religious influence until the child acquired the maturity personally to make her own choice, constituted an unwarranted judicial interference violative *325 of the natural and constitutional rights of both the infant and her mother.
The pivotal question is: "Is it well with the child?" II Kings 4:26. The paramount consideration is the safety, happiness, the physical, mental and moral welfare of the child. In re R.L., 137 N.J. Eq. 271 (Ch. 1945); Seitz v. Seitz, 1 N.J. Super. 234 (App. Div. 1949); Matflerd v. Matflerd, 10 N.J. Super. 132 (App. Div. 1950), certif. denied 6 N.J. 398 (1951); Grove v. Grove, 21 N.J. Super. 447 (App. Div. 1952). In a contest between the mother and father, neither has the superior right to the custody of the child. R.S. 9:2-4; Turney v. Nooney, 5 N.J. Super. 392 (App. Div. 1949). The propriety of the award must be scrutinized in association with the factual circumstances of the particular situation, and the court's determination is to a large degree the production of judicial discretion.
Our study of the pertinent evidence in the present case does not guide us to conclude that the denial of the custody of the child to either her father or mother in the immediate conditions was a manifestly erroneous exercise of judicial discretion. Where circumstances of weight and importance concerning the welfare of the infant transcend the strict legal rights of the parents, the court may award the custody of the infant to a stranger. Cole v. Cole, 89 N.J. Eq. 381 (Ch. 1918).
The appellant, however, asserts that the judgment offends the fundamental law in that it destines the child not to a "good foster home," but specifically to a "good Roman Catholic foster home."
We think a judicial limitation in the selection of a foster home to one in which the doctrine of a particular denominational and sectarian religious creed is avowed is normally injudicious. The more so where the implication is that the foster parents must be devout in their religious feelings.
Lord Hewart, C.J., in Re Carroll, 1 K.B. 317 (1931) stated: "I need hardly say, as has been said before in cases of this kind, that this court has no concern with any question, if question there be, of the competing merits of *326 different religious faiths. The Court addresses its mind to no such problem as that." See, also, Re Collins, 1 All Eng. Law R. 1057 (Ct. of A. 1950).
Our former Court of Errors and Appeals remarked: "Intervention in matters of religion is a perilous adventure upon which the judiciary should be loathe to embark." Donahue v. Donahue, 142 N.J. Eq. 701 (E. & A. 1948). The courts do not as yet profess definitely to know which denominational religious creed charts the most propitious avenue to salvation.
Nevertheless in awarding the future custody of an infant, the religious training of the child is appropriately an element which, in our opinion, may be considered among all the circumstances of gradational significance in promoting the general welfare of the infant. Vide, In re Turner, 19 N.J. Eq. 433 (Prerog. Ct. 1868); In re Flynn, 87 N.J. Eq. 413 (Ch. 1917); Boerger v. Boerger, 26 N.J. Super. 90 (Ch. Div. 1953). We decline to decide that it is a subject which in all such cases should by the inhibitions of law be entirely disregarded. Cf. People ex rel. Sisson v. Sisson, 271 N.Y. 285, 2 N.E.2d 660 (Ct. of App. 1936).
So, also, the predilections of the infant, if of sufficient mental maturity intelligently and rationally to formulate them, may be embraced in the deliberations of the trial court. Richards v. Collins, 45 N.J. Eq. 283 (E. & A. 1889); Callen v. Gill, 7 N.J. 312 (1951); Lavigne v. Family and Children's Soc. of Elizabeth, 11 N.J. 473, 479 (1953). It is to be supposed that any reputable person to whom custody may be awarded will probably have some sectarian religious faith. In the law the faith should neither compel nor exclude the choice. Vide, In re De Bois, 7 N.J. Misc. 1029 (Ch. 1929).
It is reasonably conceivable that to decline to entrust the custody of a child to an otherwise suitable and efficiently conducted children's home, similar institution or competent children's welfare society merely because it is maintained by a religious denomination might in numerous instances prejudicially impair the best interests of the child. In all *327 such exigencies the welfare of the child must be the supreme consideration.
We affirm the judgment in so far as it awards the custody of the infant, Ellen Rose Scanlon, to the Associated Catholic Charities of the Archdiocese of Newark, deleting therefrom the qualifying direction concerning the religious devotional characteristics of the foster home. It should be realized that the judgment in its relation to the custody of the child is always temporary in nature and may be changed at any time as the future conditions and circumstances reasonably recommend. Brown v. Parsons, 136 N.J. Eq. 493 (E. & A. 1945).
Except as so modified, the judgment under review is affirmed.