51 N.J. Super. 276 (1958)
143 A.2d 874
MARY PATRICIA SHEEHAN, PLAINTIFF-APPELLANT, CROSS-RESPONDENT,
v.
DANIEL C. SHEEHAN, DEFENDANT-RESPONDENT, CROSS APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 26, 1958.
Decided July 14, 1958.
*280 Before Judges PRICE, HANEMAN and SCHETTINO.
Mr. William M. Feinberg argued the cause for appellant (Mr. Jack Feinberg, attorney).
Mr. George F. Losche argued the cause for respondent (Messrs. Losche & Losche, attorneys).
The opinion of the court was delivered by HANEMAN, J.A.D.
Plaintiff and defendant are the divorced parents of three children. The marital relationship and familial rights and duties have been the subject of prolonged litigation (from September 1950 to date) in our trial and appellate courts. By the present appeal plaintiff-mother challenges an order of the Chancery Division by which, inter alia, that court refused to modify a prior order *281 of custody and continued the custody of the two minor children in defendant-father. Defendant cross-appeals from the same order, but not insofar as his custody is concerned. The pertinent issues raised on both appeals are discussed below.
Plaintiff and defendant were married on October 10, 1934. Three children were born of this marriage  Patricia on February 6, 1936, Suzanne on November 13, 1939, and Diane on April 19, 1941. The custody of only the latter two is involved.
Defendant, a practicing physician, enlisted in the U.S. Navy and in October 1942 went into active service. He was assigned to duty at the U.S. Medical Center at Bethesda, Maryland. Thereafter he was transferred to Pensacola, Florida, and Charleston, South Carolina. His family joined him at each of these stations. Late in 1944 he received orders for service overseas. He returned to Newark with his family and re-established the home there. He and plaintiff then journeyed to San Francisco. On December 24, 1944 he reported on board the ship which was to carry him to duty in British Samoa. On December 25, 1945 defendant arrived back at Newark. He was hospitalized for a short time (six weeks) and discharged in April 1946. During all of this period of time the family was a close-knit and affectionate unit.
During defendant's overseas service plaintiff encountered some difficulty with the Office of Price Administration (O.P.A.) regarding the rental of the marital residence. Richard J. Tarrant, a married man whose wife had borne him seven children, was the Director of O.P.A. As late as August 26, 1945 plaintiff wrote a letter in endearing terms to defendant and recounted a trip to Belmont Park with Tarrant and some others. She gave as an excuse that she required his assistance in solving the O.P.A. problems and hence could not refuse an invitation. Plaintiff eventually became employed by Tarrant as his secretary and was later financed by him in the operation of a dress shop. From the date of her acquaintance with Tarrant, plaintiff's affection for defendant cooled.
*282 For an understanding of the problems involved, a brief synopsis of the antecedent litigation, interspersed with some further factual recital, is necessary.
In September 1950 plaintiff filed suit for divorce on the ground of extreme cruelty. Immediately thereafter defendant filed a complaint for custody of the children, which action was consolidated with the action for divorce. In that same month the trial court issued an order to show cause which, inter alia, restrained plaintiff from either removing the children from the jurisdiction of the court or concealing their whereabouts. Thereafter temporary custody of the three children was given to plaintiff, without prejudice.
The trial upon plaintiff's complaint for divorce commenced in May 1951 and continued intermittently into January 1952, at which time defendant moved for leave to file a counterclaim for divorce on the grounds of plaintiff's adultery with Tarrant in December 1951. Plaintiff was permitted to abandon her action for divorce and her complaint was dismissed without prejudice. Defendant was granted leave to file the counterclaim. Defendant appealed from so much of the judgment as dismissed plaintiff's action, "without prejudice." That judgment was subsequently affirmed by the Appellate Division, Sheehan v. Sheehan, 22 N.J. Super. 326 (App. Div. 1952).
In 1952 plaintiff went to Florida and there instituted a divorce action. The proceedings were enjoined by the Superior Court of New Jersey in July 1952 and were subsequently abandoned. In that same month the court dismissed plaintiff's application to hold defendant in contempt for his failure to pay support for the children while she was in Florida.
In October 1952 defendant filed his counterclaim for divorce, to which plaintiff filed an answer. In March 1953 the divorce and custody trials came on for hearing. Meanwhile, the court denied plaintiff's application for an increase in the amount allowed for the support of the children, and her application for permission to remove them from the State of New Jersey. On March 30, 1953 a judgment nisi *283 was entered in favor of defendant on the ground of adultery as charged. Defendant was granted custody of the children, with visitation rights to plaintiff in the State of Florida for six weeks. On July 1, 1953 the judgment nisi became final.
On August 6, 1953 plaintiff married the co-respondent Tarrant in Washington, D.C. In October 1953 plaintiff, without divulging her marriage to Tarrant, filed a complaint against defendant for partition of the marital residence, which contained his professional office. Approximately a year later the property was sold at sheriff's sale, from which plaintiff received $5,000.
In July 1954 the trial court ordered that plaintiff be granted custody of the children from July 1 to August 31, providing the children were not removed from the State of New Jersey, and directed defendant to pay $25 per week per child for their support. The court also specified that Tarrant was not to associate with the children.
In September 1954 plaintiff petitioned for permanent custody of the children. During the pendency of this petition the trial court ordered that the children live with their maternal grandmother in Newark, New Jersey. In December of that same year, upon consent of defendant, the trial court gave custody to the plaintiff. On January 10, 1955 the court signed the order consistent with defendant's consent given the prior December. This order, inter alia, granted permission to plaintiff to remove the children to Bethesda, Maryland. However, between the consent and the entry of said order defendant reneged. In February 1955 he appealed from that order.
In August 1955, without any court order, plaintiff took the children to Puerto Rico, where Tarrant was then employed. In October defendant moved for immediate custody of the children because of their removal to Puerto Rico. In November the Appellate Division reversed the order of January 10, 1955 and remanded the custody action for a full and complete hearing on the merits. Sheehan v. Sheehan, 38 N.J. Super. 120 (App. Div. 1955).
*284 In May 1956 the trial court, pursuant to notice of motion to hold plaintiff in contempt of court for removing the children to Puerto Rico, gave plaintiff's attorney the opportunity to have them returned, and in June, she still being recalcitrant, plaintiff was held in contempt. In August 1956 the children were returned to Maryland. In February 1957 an order staying the enforcement of the contempt was issued and plaintiff was directed to deliver the children to defendant forthwith. On March 1, 1957 temporary custody was granted plaintiff by reason of a stay pending appeal.
Thus we come to the trial of this custody proceeding pursuant to the remand by the Appellate Division. This trial lasted for eight days, i.e., April 1, 2, 3, 4, May 28, August 7, September 23 and October 11, 1957.
In the foregoing recital it should be parenthetically noted that "trial court" denotes at least seven different members of the Bench who sat on various of the applications.
On December 16, 1957 the following judgment was entered:
"1. Custody of the two minor children of the marriage of the parties hereto, to wit: Suzanne now of the age of 17 years and Diane now of the age of 16 years shall be in the defendant, Daniel C. Sheehan, but they are not to be sent to the defendant's home, except as hereinafter stated, rather to Mount St. Mary's Academy, North Plainfield, New Jersey, beginning January 2, 1958. All expenses of tuition, clothing, board and maintenance and all other charges of said boarding school or college (the said children shall have the right to suggest to the Court the college which they wish to attend) while either or both of the girls are in attendance there are to be paid by defendant.
2. A. The plaintiff shall have the right of visitation with and temporary custody of the 2 girls during the first 7 days of the Christmas vacation, the latter 7 days of the Easter vacation and from the first day of August to the end of the summer vacation.
B. The defendant's custody of the 2 girls shall include such custody at defendant's home during the latter 7 days of the Christmas vacation, the first 7 days of the Easter vacation, from the beginning of the summer vacation to the 31st day of July and at such other times not hereinbefore mentioned when the girls may be absent from said academy.
3. During the exercise by plaintiff of such visitation rights, the defendant shall pay to each girl the sum of thirty-five ($35.00) dollars a week for her support.
*285 4. The one thousand ($1,000.00) dollars deposited by plaintiff with the Clerk pursuant to the order herein entered on October 10, 1955, now depleted to $980.42, shall be restored to $1,000.00 by plaintiff within 20 days from the date hereof and said $1,000.00 shall be retained by the Clerk as security for the return of the 2 girls to the aforesaid custody of the defendant in New Jersey until Diane reaches the age of twenty-one (21) years.
5. Since the plaintiff produced the 2 girls in court at all of the hearings except that on October 11, 1957, the plaintiff is purged of her contempt under the order herein entered on July 5, 1956.
6. The defendant is relieved and discharged from any and all obligation to pay for the support of the 2 girls by any order of this Court heretofore entered.
7. Defendant shall pay Jack Feinberg, Esq., attorney for plaintiff, counsel fees in the amount of One thousand three hundred and fifty ($1,350.00) dollars plus costs of suit to be taxed."
From this judgment plaintiff appeals and urges that:
I. The admission of certain testimony which went behind the judgment of divorce was improper.
II. The court erred in not striking prejudicial testimony which was not "connected up."
III. The defendant should have been held in contempt.
IV. The amount awarded counsel was inadequate.
V. The award of custody was "inimical to their [the two minor children] happiness and welfare."
Defendant cross-appeals and urges that the trial court erred in that:
I. The two minor children of the marriage of the parties hereto, to wit, Suzanne and Diane, are not to be sent to the defendant's home except as stated in the judgment.
II. All expenses of tuition, clothing, board and maintenance and all other charges of boarding school or college for said children are to be paid by defendant.
III. Plaintiff is to have certain rights of visitation.
IV. Defendant's custody is limited.
V. Defendant is required to pay $35 a week to each girl for her support during the exercise by plaintiff of plaintiff's visitation rights.
VI. The amount of security deposited by plaintiff with the Clerk is limited to $1,000.
VII. Plaintiff is purged of contempt.
*286 VIII. Defendant is required to pay Jack Feinberg, Esq., attorney for plaintiff, a counsel fee of $1,350 plus costs of suit to be taxed.
Plaintiff's grounds for reversal will be considered in the order above set forth.

I.
Plaintiff urges that the trial court erred in admitting evidence which concerned events antedating the judgment nisi. Defendant offered proof, admitted over plaintiff's objection, concerning events preceding the judgment awarding custody. Plaintiff argues that the judgment nisi is res judicata on the question of custody "as to facts then in existence" and that "only facts arising since the entry of the judgment should be considered."
The matter under review was tried by virtue of the mandate on reversal of this court, dated November 15, 1955, A-329-54, Sept. term 1954. This mandate reads, in part:
"* * * that the record and proceedings be remitted to the said Superior Court, Chancery Division, to be there proceeded with in accordance with the rules and practice relating to that Court, consistent with the opinion of this Court."
The opinion of the court, to which reference is made in said mandate, is reported in Sheehan v. Sheehan, 38 N.J. Super. 120 (App. Div. 1955). This opinion reads, in part:
"In view of the foregoing we are constrained to remand the issue to the trial court for a full hearing so that all the facts and circumstances regarding the fitness of the parents and the welfare of the children may be considered."
The order to show cause, dated December 20, 1956, upon which the present litigation is predicated, reads, in part:
"This matter being opened to the Court by Jack Feinberg, Esq., attorney for the plaintiff, and the Court having read the verified petition filed herein and it appearing therefrom that the Appellate Division has ordered this Court to conduct a full hearing on the question of the custody of the three infant children of the marriage, that no such hearing has as yet been held, * * *."
*287 An examination of the foregoing leads to the conclusion that the trial court was directed to examine all of the facts and circumstances regarding the fitness of both parents as it bears upon the question of the welfare of the children, in order to determine which parent should be awarded custody. Such an inquiry must of necessity include events which preceded as well as those which succeeded the judgment nisi. Therefore, the trial court, as it was required to do, complied with the express terms of the mandate in admitting the testimony objected to. In re Plainfield-Union Water Co., 14 N.J. 296, 303 (1954); Isserman v. Isserman, 2 N.J. 1 (1949); Fiore v. Fiore, 49 N.J. Super. 219 (App. Div. 1958).
In any event, it must be remembered that plaintiff seeks to "amend" the original judgment of custody. We are not here confronted with an attack upon a final judgment by an unsuccessful litigant based on matters which predated that judgment, but rather with an attempt to modify such a judgment by an unsuccessful litigant upon the grounds that circumstances have changed since the original adjudication. The evidence is not proffered by the plaintiff who seeks to modify, but rather by the defendant who seeks to negate plaintiff's contention that circumstances which affect her fitness and the welfare of the children have changed, and so sustain the judgment.
There is no doubt that a judgment involving the custody of minor children is subject to modification at any time upon the ground of changed circumstances, In re Erving, 109 N.J. Eq. 294 (Ch. 1931); Casteel v. Casteel, 45 N.J. Super. 338 (App. Div. 1957), and that the party seeking a modification bears the burden of proof. 17A Am. Jur., Divorce & Separation, § 838; 27 C.J.S. Divorce § 317(5).
The primary consideration of the court in matters of this type is the welfare of the children. The basic issue is a change in the circumstances which would affect the welfare of the children. In order to determine whether the circumstances have so changed since the original judgment as to warrant a modification, a court must have some knowledge *288 or information as to the circumstances which existed on the date of the original judgment. This is for the twofold purpose of (1) acquainting the court with the facts which existed at the time that the original judgment was entered, so that he may ascertain what motivated the original judgment and determine whether there has been any change in circumstances, and (2) aiding the court in evaluating the bona fides of the person who seeks a modification upon the grounds of change in his status of fitness. Such evidence has a vital and essential bearing upon the welfare of the child.
It must be plain that if the trial court has neither the benefit of hearing the original testimony nor even that of examining a stenographic record thereof, his task would be almost impossible of accomplishment.
A judge who neither heard the original application nor has had the benefit of a stenographic record of prior proceedings should admit such evidence. Jenkins v. Jenkins, 304 Mass. 248, 23 N.E.2d 405 (Mass. Sup. Jud. Ct. 1939); Hinds v. Hinds, 329 Mass. 190, 107 N.E.2d 319 (Mass. Sup. Jud. Ct. 1952); see, also, Casteel v. Casteel, supra; 17A Am. Jur., Divorce & Separation, § 838; Annotation, 9 A.L.R.2d 623 (1950); 27 C.J.S. Divorce § 317(6).
It is to be noted that the trial judge sub judice was the seventh judge to hear proceedings covering custody and related matters. He had not heard any of the prior facets of the litigation.
The trial judge did not err in admitting the questioned testimony.

II.
Plaintiff next urges that the trial judge erred in admitting testimony concerning the "Grunewald incident."
Briefly stated, this testimony concerned the use by one Grunewald of an apartment controlled by Tarrant. No needful purpose will be served to relate in detail what occurred during Grunewald's occupancy. Suffice it to say that the incident might serve to disclose the types of persons with *289 whom Tarrant associated and consorted. The evidence was admissible, since it serves to disclose the atmosphere in which the children would be raised if they became a part of Tarrant's household. Therefore, it was material and relevant on the question of the welfare of the children. The weight to be accorded to this testimony was, of course, for the trial judge.
The trial court did not err in admitting the "Grunewald incident" testimony.

III.
Plaintiff asserts that defendant should have been held for contempt for failure to make the support payments as required by the order of January 10, 1955, or that the court should have made an order directing the payment of arrearages.
The answer to plaintiff's assertion is found in the fact that on November 15, 1955 the mandate on reversal of the Appellate Division of the Superior Court provided:
"It is hereupon ordered and adjudged that the Order of January 10, 1955 of the said Superior Court, Chancery Division, is in all things reversed, set aside and for nothing holden, without costs."
Plaintiff sought to hold defendant guilty of contempt for failure to make payments provided in the order of January 10, 1955 by an order to show cause dated and filed December 20, 1956. On that date the order had been nullified ab initio. Therefore, defendant could not have been guilty of a civil contempt for failing to make payments.
The trial judge did not err in failing either to hold defendant guilty of contempt or directing that he make some payment.

IV.
Plaintiff urges that fees allowed her counsel were inadequate.
*290 Defendant argues that it was improper to make any allowance of counsel fee to plaintiff, since she has remarried and is no longer his wife.
We are acquainted with Turney v. Nooney, 21 N.J. Super. 522, 527 (App. Div. 1952), in which the court held that a divorced wife who had remarried was not entitled to an allowance of counsel fees in connection with custody litigation subsequent to her remarriage. However, in Callen v. Gill, 7 N.J. 312, 321 (1951), our Supreme Court held contrawise. We are therefore bound to hold that an allowance of counsel fee to plaintiff was proper.
The amount of allowance is discretionary with the court. We see nothing in the record which would justify a holding that the court had abused its discretion. Seitz v. Seitz, 6 N.J. Super. 65 (App. Div. 1949).
The above disposes of point VIII of defendant's grounds of cross appeal.

V.
Plaintiff urges that "The judgment below denying plaintiff custody is inimical to the happiness and welfare of Diane and Suzanne Sheehan."
A resolution of this contention necessitates the consideration of two problems which are so intertwined that they shall be considered together, i.e., (1) the fitness of plaintiff, and (2) the welfare of the minor children.
At the outset, some of the oft-repeated precepts which govern cases involving the custody of children bear restatement:
Neither parent has the greater right to the custody of a child. R.S. 9:2-4 as amended, L. 1948, c. 321, p. 1296, sec. 4; Turney v. Nooney, 5 N.J. Super. 392, 397 (App. Div. 1949); Fantony v. Fantony, 21 N.J. 525 (1956); In re Jackson, 13 N.J. Super. 144 (App. Div. 1951).
The law, however, favors the mother as custodian of children of tender years. This axiom finds its basis not on any rule of law but rather upon the theory that the mother will take better and more expert care of such a child than *291 the father. Seitz v. Seitz, 1 N.J. Super. 234 (App. Div. 1949); In re Jackson, supra; Grove v. Grove, 21 N.J. Super. 447 (App. Div. 1952).
The pivotal factor and paramount consideration in matters involving custody of minor children is the happiness and welfare of such children. This has been construed as meaning the "safety, happiness, physical, mental and moral welfare of the child." Fantony v. Fantony, supra, 21 N.J. at page 526. See, also, Clemens v. Clemens, 20 N.J. Super. 383 (App. Div. 1952); Scanlon v. Scanlon, 29 N.J. Super. 317 (App. Div. 1954).
The preference of a young child has a place in the determination of custody, but is not conclusive. Callen v. Gill, 7 N.J. 312, 319 (1951); Boerger v. Boerger, 26 N.J. Super. 90, 103 (Ch. Div. 1953).
The court will look at the "character, condition, habits and other surroundings" of the parents in considering their fitness and the welfare of the children. Clemens v. Clemens, supra, 20 N.J. Super. at page 392; Richards v. Collins, 45 N.J. Eq. 283, 287 (E. & A. 1889).
A mother will not be disqualified merely because of matrimonial misconduct  even for the commission of adultery. In case of such misconduct it must appear that in spite thereof it is for the best interests and welfare of the child to award custody to the mother. Matflerd v. Matflerd, 10 N.J. Super. 132 (App. Div. 1950), certiorari denied 6 N.J. 398 (1951); Fantony v. Fantony, supra.
"* * * [T]he word `misconduct' * * * means proof of such `misconduct' as would characterize the parent as `unfit' or `unsuitable'. * * *" Matflerd v. Matflerd, supra, 10 N.J. Super. at page 138. The term is used to designate "* * * such conduct as to deprive the parent of a moral right to the child's custody * * *." Grove v. Grove, supra, 21 N.J. Super. at page 454.
If the mother desires to retain the primary custody of her child, it is her duty to aid and encourage the father's sincere effort to enhance the mutual love, affection and respect between himself and his child and not merely to refrain from active resistance thereto. Turney v. Nooney, *292 supra. This is the general rule, but especially is it so where the mother is the one guilty of the matrimonial offense for which the divorce was granted.
If the court concludes that it is for the best interest of the child, it may refuse custody to either parent and grant custody to a stranger. Scanlon v. Scanlon, supra, 29 N.J. Super. at page 325; Richards v. Collins, supra.
Each case involving custody of minor children must be decided upon its own particular facts. Matflerd v. Matflerd, supra.
The denial of the wife of visitation rights adjudged by the court, and removal of the child contrary to an order of the court, may be considered as elements finally determining the question of custody. Sheehan v. Sheehan, 38 N.J. Super. 120, 127 (App. Div. 1955); In re Shaheen, 127 N.J. Eq. 75 (E. & A. 1940).
All of the foregoing rules have as their keystone the "welfare" of the child.
"Welfare" of the child includes many elements and concerns more than the physical well-being resulting from the furnishing of adequate food, clothing and shelter. It concerns, inter alia, the spiritual and social welfare of the child. The "desire" of the child to reside with either parent has, on occasion, been over-emphasized on the grounds of his so-called happiness. Happiness does not denote that state of mind which results from untrammeled or unchecked conduct. There should be no confusion between an unrestrained liberty or license which results in no check upon the child's conduct and the happiness which results from a well-adjusted mental outlook and genial social relationship. In order for the child to take his place in society as a well-adjusted adult, he should have instilled in him the principles of obedience, discipline and respect, during his formative years. He should be taught the foregoing principles by affirmative parental deed as well as by parental example. Unless he learns discipline, respect and obedience as a child, he cannot be expected to exhibit those traits as an adult. Absent such characteristics he is apt to become a maladjusted adult, disturbed, discontented *293 and unhappy. The ultimate test of whether a parent has so reared a child is often found in the conduct of the child, and such conduct may guide the court in reaching a final conclusion.
It therefore becomes necessary to examine the proofs at the trial.
The picture that unfolds is of a happy, congenial family until 1946. In that year plaintiff wrote defendant:
"Daniel sweetheart 
Here it is a whole four days since I last wrote you and it makes me feel badly when I let so long a time elapse. However, I have been up to my neck in your affairs, so much so, that I have literally fallen into bed at night exhausted.

* * * * * * * *
Thursday I had another call from the OPA  and in case I didn't tell you before  I had an investigator here  and then more red tape. On Friday, I was invited to see the races at Belmont and had a rather nice time. This Mr. Tarrant  head of the OPA in N.J. organized the party and asked me to go. I went with reservations but knew if I didn't, my chances of getting this house mess cleared up might be dimmed. However, that is only my opinion and since I am sort of `hicky' about these parties  perhaps my judgment is not correct. At any rate, the horses ran well even if it poured rain all afternoon and I didn't lose a dime  because I played only one hunch  ($2  real sport, eh?) and it won  so that was alright. I got home about 9:30 p.m. after a very nice dinner in New York. This crowd is sporty, Dan, and for my money I'll have your kind of fun any day. You know, whenever I go out like this  I miss you dreadfully and feel so miserable that the fun is lost on me. Of course, you realize that I know this is silly but you are my darling so I can't help this feeling.

* * * * * * * *
The children are fine and outside of all these extras I feel pretty good. Bob F. manages to keep me sane and in love with you by continually telling me what a swell fellow you are even if you left me in this mess. However, I usually agree except when I'm in one of my bad moods and have to blame everything on you. Feminine weakness, eh?
Anyway, darling, you keep well and come home looking dapper and smooth and we'll battle the world together.
All my love, now and always,
Your Pat"
Prior to the termination of defendant's military career, plaintiff became acquainted with Richard J. Tarrant. The *294 relationship of plaintiff and defendant worsened as her infatuation with Tarrant increased. In 1950 she disappeared with defendant's three children. They were later discovered in Oakhurst, New Jersey. It is at this residence where she was living with her three children that the court found she had committed adultery with Tarrant. Thereafter, contrary to the order of the court, she removed her three children to Puerto Rico. For this action she was held guilty of contempt and labelled by the then judge, now Chief Justice Weintraub, as "willful." Except for a comparatively short period of time, approximately one year, plaintiff has had actual custody of the children by virtue of various temporary orders. During that year  1953-1954  defendant had actual custody. While with defendant, the three girls hurled foul epithets at him, unjustly accused him to the police of failing to feed them, raised such a commotion on the floor above defendant's office as to interfere with his interview of patients. Plaintiff, although professing to supervise the religious education of the children, has been admittedly excommunicated from the Roman Catholic Church as a result of her marriage to Tarrant. She testified, however, that she attends church regularly. The two daughters testified that they preferred living with their mother and that they loved Tarrant.
The record clearly discloses that the girls' dislike for defendant borders on hatred. They seem to place all of the fault for the dissolution of the marriage and the attendant publicity upon defendant. The children hold plaintiff completely free of sin or blame, although she was found to have committed adultery in the very house in which they were, at that time, sleeping. Plaintiff ignored an order in 1954 that the children were not to associate with Tarrant. They magnify out of all proportion comparatively minor disciplining by the father when they were of tender years. Their testimony in some instances can be conservatively typified as unbelievable. Both girls testified that their love for defendant cooled in 1952 or 1953. It is significant that this was after defendant discovered Tarrant in their Oakhurst home.
*295 Plaintiff, by her conduct, has exhibited a willful frame of mind ever since her first association with Tarrant. Her utter disregard of social and moral responsibility from that time has served to set an example which makes her unfit to have the custody of the children awarded to her. The court is not so naive as to believe that the dislike of the children for their father was occasioned without actual, though perhaps subtle, stimulation by the mother. She has succeeded in kindling disrespect for a parent  a situation which must have made a deep if not a lasting impression on the minors.
By her defiant attitude in removing the children to Puerto Rico she has as well presented her children with a spectacle of disrespect and disregard for law and order whenever there is a conflict between her desires and legal duties.
The children's association with Tarrant, who left his own wife and numerous progeny, cannot be said to be a desirable one, especially in light of a prior court order which proscribed such contact. It is significant, moreover, that plaintiff elected not to call Tarrant as a witness to testify as to any of the material facts bearing on the alleged changed circumstances which might move the court to reconsider its prior order of custody.
The children themselves have shown a need for some instruction in discipline and obedience. The result of their training by plaintiff leaves much to be desired.
The trial judge has the opportunity to observe the conduct and demeanor of witnesses and a better opportunity than a reviewing court. His conclusions are entitled to great weight and will not be lightly disturbed on appeal. Zehrer v. Zehrer, 5 N.J. 53 (1950); Friedman v. Friedman, 37 N.J. Super. 52 (App. Div. 1955).
The plaintiff has failed to prove such a change of circumstances as should move the court to modify its original order of custody to the extent of granting such custody to her. However, in view of their present ill-feeling towards defendant, an order which would compel the children to reside permanently with defendant would be inimical to their welfare.
*296 The trial judge arrived at the proper solution by awarding custody to defendant and by providing for the attendance of both girls at a boarding school or college, with visitation rights divided between the parents during holidays. It is directed, however, that a college be selected some distance removed from plaintiff's home in Maryland so that the girls will be resident rather than day students.
Defendant's grounds for cross appeal numbered I through V above have been generally treated in the foregoing.
We conclude that defendant's grounds VI and VII are without merit, and find no fault with the balance of the judgment.
Affirmed as modified and remanded to the trial court, with directions to enter a judgment consistent with this opinion.
A counsel fee of $1,000, payable by defendant, is allowed to plaintiff's counsel on this appeal.