686 P.2d 981

**Deanna Jane STROSNIDER, Petitioner-Appellant,**

v.

**Lloyd Nelson STROSNIDER, Respondent-Appellee.**

**No. 7399.**

Court of Appeals of New Mexico.

July 26, 1984.

Paul W. Robinson, K. Dianne Katz, Robinson, Stevens & Wainwright, P.A., Albuquerque, for petitioner-appellant.

Margaret E. Davidson, Elizabeth E. Whitefield, Keleher & McLeod, P.A., Albuquerque, for respondent-appellee.

## OPINION

BIVINS, Judge.

The parties in this case were legally separated by a Final Decree entered in September, 1981, which awarded them joint legal custody of their six minor children, with physical custody to the petitioner, Mrs. Strosnider. In January, 1982, the respondent, Mr. Strosnider, moved the court to change the physical custody of the minor children to him, or, alternatively, to ensure that he actually share the joint custody of the children by having an equal voice in all major decisions concerning their care and control. This action was prompted in part by Mrs. Strosnider's withdrawing the children from public school and entering them in the "Holy Innocents' School" [HIS], which she established.

Following a hearing, the court entered a stipulated order in which it was agreed, inter alia, that the parties would cooperate in arranging a suitable education program for the children; if they failed, the court would appoint a special master to assist in resolving their differences. The parties could not reach an agreement, and a special master was appointed to determine whether HIS constituted a private school or a home school prohibited by statute.

The court adopted the special master's report in which he found that HIS does not qualify under New Mexico laws as a private school. The court ordered the children disenrolled from HIS and immediately enrolled in a qualified private or public school. The court refused to grant Mrs. Strosnider's motion to stay the order, but the briefs indicate that it was in fact never enforced, and the children continue to attend HIS. Mrs. Strosnider appeals from the order.

She raises two issues: first, whether HIS qualifies as a private school under the laws of this State; and, second, whether she has the right to provide an alternative means of

education distinct from that available through the public school system or established private schools. We hold that HIS qualifies as a private school under New Mexico statutes, and that to the extent a right to make decisions concerning a child's education exists, that right is shared equally between parents having joint legal custody of their children.

HIS opened in January 1981, in a converted artist studio at Mrs. Strosnider's home. It originally enrolled nine students, including six minor Strosnider children, and was taught by the parties' oldest daughter, Susan Strosnider, then twenty-three years old. Susan graduated from Del Norte High School in 1974, after completing a schedule of courses which did not include college preparatory classes or any advanced science or math. She did not attend college or receive any professional instruction in teaching and has not received teacher certification from the state.

During the 1981–1982 school year, the six minor Strosnider children were the only students at HIS. In January 1983, the school was relocated to a building about fifteen minutes walk from the Strosnider children's home. At that time, the school registered three non-Strosnider children. Susan taught grades 1, 4, 5, 8, 10 and 12 with the assistance of a younger sister and a music teacher who came in one afternoon a week. In addition to music, HIS offered courses in English, religion, mathematics, reading, history, art, science, home economics and recreation. It provided the students with new textbooks as well as discarded textbooks from the Albuquerque Public Schools and library books purchased at the annual public library book sale.

At the end of the 1982–1983 school year, Lori Strosnider graduated from HIS and received a high school diploma issued by the New Mexico State Board of Education and signed by the State Superintendent of Public Instruction.

Except for tuition of $100 per month paid by non-Strosnider children, all financial support for HIS came from Mrs. Strosnider. She conceived the idea of establishing the school in December, 1980, when she read an article about a family in Carlsbad which had begun a family school. Mrs. Strosnider testified that she had had a number of conflicts with the Albuquerque Public Schools which her children had attended during previous years, including, among other things, matters involving sex education, psychological testing requiring a child to choose only negative adjectives to describe a parent, and in athletics, requiring a child to lose ten pounds in a week so that he could participate. She said she viewed the article about the Carlsbad family as "just like an answer to prayer for me." She obtained information about zoning, licensing, immunization and attendance laws and made sure the school complied with all legal requirements. Matters of curriculum and teaching methods, she left to her daughter, Susan.

At the hearing, Mr. Strosnider called a curriculum evaluator from the State Department of Education as an expert witness. She reviewed the HIS teacher plan book, test samples and a list designating texts used by each individual student at the school. On the basis of those materials, she testified that, in her opinion, the school's curriculum was inadequate to meet the academic goals of HIS as described by the teacher in her deposition.

## I. Home School or Private School

The special master, appointed by the trial court in this case, determined that "the Holy Innocents [sic] School does not qualify under New Mexico laws as a private school." While the report of the special master was well thought-out and carefully constructed, we are compelled to disagree with his conclusion.

New Mexico's compulsory school attendance statute requires that "[a]ny qualified student * * * shall attend a public school, a private school or a state institution." NMSA 1978, § 22-12-2 (Repl.Pamp.1984). The legislature defines "private school" as "a school offering programs of instruction not under the control, supervision or management of a local school board *exclusive*

*of home instruction offered by the parent,* guardian or one having custody of the student". NMSA 1978, § 22–1–2(I) (Repl. Pamp.1981) (emphasis added).

The special master describes HIS as "a family school" which "[a]s a practical matter * * * is for the primary benefit of only those children who come from the Strosnider home." Nonetheless, HIS meets the technical requirements of the statute defining private schools. The Strosnider children attend classes in a building separate from their home and are instructed by a teacher who is not their parent. Mr. Strosnider argues that Mrs. Strosnider is the one who actually "offers" instruction at HIS, because she provides philosophical and financial support. As Mrs. Strosnider points out, however, most parents who send their children to a private school offer at least philosophical, if not financial support.

The special master relies upon "the purpose and intent of the Compulsory School Attendance Law" and "common sense" in reaching his conclusion that HIS does not qualify as a statutory private school. This Court has described one purpose of the compulsory school attendance statute as ensuring that "children are exposed to at least one other set of attitudes, values, morals, lifestyles and intellectual abilities" by having contact with other children outside of their immediate family. *State v. Edgington,* 99 N.M. 715, 663 P.2d 374 (Ct. App.1983). The record indicates that at the time of the hearing three non-Strosnider children attended HIS, that the school had twelve additional student applicants in 1982, that it had a waiting list of teachers who had expressed an interest in working at HIS, and that the present teacher had plans to expand the school and to continue teaching there after all of her sisters had graduated. These uncontradicted facts tend to show that the exposure to others, which was not present in *Edgington,* exists at HIS.

Other legislative purposes of the compulsory school attendance statute are not so easy to discern. While it is clear that the legislature wishes to provide for the education of all New Mexico children, the contemplated boundaries of that education are not clear in the private school context. The legislature has not set teacher or curriculum standards for determining what qualifies an educational entity as a private school. While nothing would appear to prevent the legislature from setting minimum standards for private schools, *see generally Santa Fe Community School v. New Mexico State Board of Education,* 85 N.M. 783, 518 P.2d 272 (1974), *quoting Packer Collegiate Institute v. University of State of New York,* 273 App.Div. 203, 76 N.Y.S.2d 499 (1948), it has not seen fit to do so, and we cannot act in its stead. In *Santa Fe Community School,* the Supreme Court limited the State School Board's authority to regulate private schools to that expressed by the legislature. In the present case, the special master relied upon common sense to impose requirements, not expressed in the statutes, upon private schools. We cannot concur in that result without some indication from the legislature as to what requirements, if any, it wishes to impose. *See Santa Fe Community School; Edgington.* Thus, we hold that HIS meets the requirements to qualify as a statutory private school under the current New Mexico Statutes.

█ Because we cannot determine how the trial court would have viewed the best interests of the minor Strosnider children had it recognized HIS as a statutory private school, we remand for a new decision in the case.

## II. Parental Right to Make Decisions Concerning Education of Children in Joint Custody

Mrs. Strosnider contends she has a constitutional right to direct the education of her children "without interference from ... Mr. Strosnider". Mr. Strosnider argues he also has a right to participate in making decisions regarding the children's education, since he shares joint custody with Mrs. Strosnider. He seeks to assert his

rights as joint custodian or, in the alternative, to obtain physical custody of the children. Because of our disposition under the law of joint custody, we need not reach the merits of Mrs. Strosnider's claim that a parent has the constitutional right to educate her children as she chooses.

In June, 1981, the district court awarded Mr. and Mrs. Strosnider joint legal custody of the minor children "affecting all major decisions concerning the care and control of such children," and again awarded them joint legal custody with physical custody to Mrs. Strosnider in September 1981, in the Final Decree of Legal Separation. In doing so, the court acted in conformity with the legislative purpose of encouraging joint custody whenever it is in the best interests of children. *See* NMSA 1978, § 40–4–9.-1(A) (Repl.Pamp.1983).

The legislature defines joint custody in Section 40–4–9.1(C):

> "[J]oint custody" means an order of the court awarding custody of a minor to both parties and providing that physical custody shall be shared by the parties in such a way as to assure the minor of frequent and continuing contact with both parties; provided that the order may award joint legal custody without awarding joint physical custody. In any award of joint custody, both parties shall be given responsibility for the physical, mental and emotional well-being of the minor.

A New York trial court has described joint custody as "giving to both parents an equal voice in the children's education, upbringing, and general welfare." *Odette R. v. Douglas R.*, 91 Misc.2d 792, 399 N.Y.S.2d 93 (1977). A more comprehensive description appears in Steinman, *Joint Custody: What We Know, What We Have Yet to Learn, and the Judicial and Legislative Implications*, 16 U.C.D.L.Rev. 739, 740 (1983).

> Joint custody is many things; it is an ideal, a policy, and a set of expectations that influences how parents and children live and relate to one another after marital separation. The following ideas and

values distinguish joint custody: first, both parents are viewed as equally important in the psychological and physical life of the child; second, both parents share authority for making decisions about the children; third, parents cooperate in sharing the authority for and the responsibilities in raising their children; and fourth, children spend a significant amount of time living with each parent.

In some jurisdictions joint custody has been recognized as a viable and worthwhile form of child custody, *see, e.g., Beck v. Beck*, 86 N.J. 480, 432 A.2d 63 (1981); in others, courts take a negative view of the concept. *See, e.g., In Re Marriage of Manuele*, 107 Ill.App.3d 1090, 63 Ill.Dec. 760, 438 N.E.2d 691 (1982). Since the New Mexico legislature has endorsed the joint custody concept, we look to cases from jurisdictions which take a favorable view of the arrangement. We note also that a number of commentators have discussed the advantages and disadvantages of joint custody. *See, e.g.,* Skoloff, *Joint Custody: A Jaundiced View*, 20 Trial 52 (March 1984); Bodenheimer Address, *Joint Custody*, 16 U.C.D.L.Rev. 739–783 (1983); Comment, *Joint Custody in Louisiana*, 43 La. L.Rev. 85 (1982); Folberg and Graham, *Joint Custody of Children Following Divorce*, 12 U.C.D.L.Rev. 523 (1979); Miller, *Joint Custody*, 13 Fam.L.Q. 345 (1979); Bratt, *Joint Custody*, 67 Ky.L.J. 271 (1978–79).

■ In considering the best interests of the child for the purpose of a custody determination, a court, recognizing the interdependence which binds a family, must also necessarily consider the interests of the parents. Studies have indicated that mothers with sole custody "become emotionally and physically exhausted, as well as socially isolated," and that mothers perceive the greatest advantage of joint custody as "the sharing of responsibility for the children." *See,* Folberg and Graham, *supra,* at 553 (footnotes omitted); *see also* Steinman, *supra,* at 743. With respect to fathers:

> In her unpublished doctoral dissertation on Fathers, Children, and Joint Custody,

Judith Greif reported that her research showed that after divorce men experienced stress that sometimes caused physical problems, depression, and a severe sense of loss. In the usual pattern, fathers lose wife, home and children, and end up with only visitation rights and support obligations. Some men become so overwhelmed by these difficulties that sooner or later they just give up and stop seeing their children.

Folberg and Graham, *supra*, at 555 (footnotes omitted). Fathers viewed the " 'opportunity for the child to maintain contact with both parents' " as the greatest advantage of joint custody, *id.* at 556, thus, indicating the value they placed on becoming something more than a "zoo daddy". *See Beck v. Beck.*

▮ The task ·of making child custody decisions is a very difficult one:

When judges make custody decisions, they act in an extra-legal capacity. The standard given them does not require the application of law, but the application of psychological principles with which to deduce, or perhaps divine, what is best for the child. The standard principles are that the children need love and nurture together with stability and continuity. The court's goal is to place the child in the environment where these needs will be best met.

Bratt, *supra*, at 296 (footnote omitted). In considering whether joint custody would promote the best interests of children:

[T]he court must determine whether the children have established such relationships with both parents that they would benefit from joint custody. For such bonds to exist the parents need not have been equally involved in the child rearing process. See Bratt, *supra*, 67 Ky.L.J. at 296. Rather, from the child's point of view it is necessary only that the child recognize both parents as sources of security and love and wish to continue both relationships.

*Beck*, 432 A.2d at 71. In addition, the court must find that both parents are fit, both desire continuing involvement with their children and both are able to communicate and cooperate in promoting the children's best interests. *Beck; In Re Wesley J.K.*, 299 Pa.Super. 504, 445 A.2d 1243 (1982). To have the ability to cooperate, the parents need not have an amicable relationship: "a successful joint custody arrangement requires only that the parents be able to isolate their personal conflicts from their roles as parents and that the children be spared whatever resentments and rancor the parents may harbor." *Beck*, 432 A.2d at 71–72 (citation omitted).

We recognize, as has the legislature in encouraging joint custody only when it is in the best interests of the child, that the arrangement is not for everyone. Neither parent in the case before us, however, argues that the trial court improperly awarded joint custody in the first instance. It appears from the record that both Mr. and Mrs. Strosnider are exemplary parents who care deeply for their children and are committed to raising them in the best way possible. In this appeal, Mrs. Strosnider contends she has a constitutional right as a parent to make decisions regarding her children's education and religious beliefs. She fails to recognize, however, that Mr. Strosnider, as joint custodian, has an equal right to make important decisions. Thus, while both Strosniders are committed to ensuring the best interests of their children, they differ philosophically as to the means for achieving this goal.

Parents, like the Strosniders, who share joint custody will sometimes find themselves facing difficult problems. *See* Bratt, *supra*, at 304. They may discover they have a need for outside support from the community, including family counseling and conciliation or mediation services. By relying upon these community resources, most families will be able to effectively resolve conflicts which arise in implementing joint custody. The district court here encouraged the parties to try mediation and to explore the services available at the court clinic. When they failed to make any progress, it appointed an agreed-upon special master to assist in resolving the con-

flict concerning the Strosnider children's education. We commend the trial court's efforts to offer the parties various methods to resolve their dispute by utilizing community resources. Since, however, the parties have failed to reach an agreement, we discuss the options available to the trial court in rendering a decision upon remand.

The options include either resolving the dispute for the parents without changing their legal status, or making a change in their legal status by modifying the custody award. In choosing which option to take, the trial court should consider a number of factors, including those set forth below.

The first option might initially appear, and in some cases prove, to be the most efficient. We recognize, however, that trial courts have neither the time nor the resources to remain constantly available to act as referees in family disputes. Thus, this option, while available, may not emerge as the most effective one.

■ With regard to the second option, we adopt the reasoning of the New Jersey Supreme Court:

Traditional enforcement techniques are singularly inappropriate in a child custody proceeding for which the best interests of the child is our polestar. Despite the obvious unfairness of allowing an uncooperative parent to flout a court decree, we are unwilling to sanction punishment of a recalcitrant parent if the welfare of the child will also suffer. However, when the actions of such a parent deprive the child of the kind of relationship with the other parent that is deemed to be in the child's best interests, removing the child from the custody of the uncooperative parent may well be appropriate as a remedy of last resort.

*Beck*, 432 A.2d at 72 (citations omitted). Like the New Jersey court, our legislature has also emphasized the importance of applying the "best interests" test when modifying or terminating joint custody:

An order for joint custody may be modified or terminated upon the motion of one or both parties or on the court's own motion if the best interests of the minor

require the modification or termination of the order. The court shall state in its order the reasons for modification or termination of the joint custody order if either party opposes the modification or termination order.

Section 40–4–9.1(B).

■ The New Jersey courts recognize an affirmative duty in the custodial parent "to aid and encourage the * * * [non-custodial parents'] sincere effort to enhance the mutual love, affection and respect between * * * [the noncustodial parent] and * * * [the] child and not merely to refrain from active resistance thereto." *Sheehan v. Sheehan*, 51 N.J.Super. 276, 143 A.2d 874 (1958). A similar policy exists in New Mexico. In cases where custodial parents have failed to fulfill their duty of fostering a good relationship between children and their non-custodial parents, the Supreme Court has allowed termination of support payments or use of the failure as a factor in determining the amount of child support. *Gomez v. Gomez*, 92 N.M. 310, 587 P.2d 963 (1978); *Spingola v. Spingola*, 91 N.M. 737, 580 P.2d 958 (1978).

In *Dodd v. Dodd*, 93 Misc.2d 641, 403 N.Y.S.2d 401 (1978), a New York trial court refused to continue a joint custody arrangement and awarded custody to the mother on the basis that she was "more flexible and conciliatory with regard to physical custody of the children and * * * [could] be expected to cooperate fully with liberal visitation and frequent contact between her daughters and their father." *Id.*, 403 N.Y.S.2d at 406. The court stressed the fact that the father was uncompromising and gave little weight to the views of his ex-wife, while she continued to respect him as a good father and would rely on him "for valuable assistance in making decisions as to education, medical and psychiatric care and general welfare." *Id.*, 403 N.Y.S.2d at 406. The court concluded that with the mother as custodian the children would have a better chance "to form positive images of both parents." *Id.*, 403 N.Y.S. at 407.

When a joint custody arrangement breaks down in such a manner as to injure the relationship between children and a parent, it would seem appropriate in some cases to award sole custody to the parent "who did not precipitate the failure." Folberg and Graham, *supra*, at 551 (footnote omitted). New Mexico courts, faced with the difficult task of making this type of decision, should continue to focus on the best interests of the children in a manner consonant with the rationale set forth in *Beck*.

We note in the *Beck* case that the Beck children expressed a preference for one of the parents as sole custodian and that the trial court concluded "they had been 'persuaded' to make their statements of preference and that the defendant's negative attitude toward joint custody had 'consciously or unconsciously spilled over' to the children." *Id.*, 432 A.2d at 73 (footnote omitted). The *Beck* court approved the trial court's failure to fully accommodate the children's wishes as not unreasonable under the circumstances.

Commentators have pointed out that some joint custody arrangements are plagued by problems which arise when parents "are not yet ready to fully dissolve their relationship and are unable 'to separate in a healthy way.'" Folberg and Graham, *supra*, at 552 (footnote omitted); *see also* Steinman, *supra*, at 744. This type of problem may be a factor in the present case and deserves consideration in further proceedings.

**CONCLUSION**

A joint custody award contemplates an equal exercise of power by parents who share the responsibility of making important decisions regarding their children. When joint custody parents fail to accommodate one another and cannot reach agreement, even with the assistance of counselors, conciliators, mediators or arbitrators, the court has few options available. It may make the controverted decision itself and enforce its determination without changing the legal status of the parents, or it may reevaluate the best interests of the children in light of either or both parents' failure to fulfill joint custody responsibilities, and modify their custody by applying the general principles set forth in this opinion. A trial court has wide discretion in making custody decisions. *See Creusere v. Creusere*, 98 N.M. 788, 653 P.2d 164 (1982). Thus, in the present case, the trial court could continue joint custody in its present form, change physical custody while retaining joint legal custody, or terminate joint custody and award sole custody to one parent.

The trial court's decision that HIS is not a statutory private school is reversed, and the case remanded for a disposition in accordance with this opinion. The trial court may wish to appoint a guardian ad litem to assist on remand. *See* NMSA 1978, § 40–4–8 (Repl.Pamp.1983). We recommend that the parties be given an opportunity to further explore alternative methods of resolving their differences through the court clinic or other community resources with the restriction that a decision should be made or approved by the district court before the beginning of the coming school year.

Each party shall bear his or her own appellate costs.

IT IS SO ORDERED.

DONNELLY, C.J., and WOOD, J., concur.