# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0181-20

C.O.,

    Plaintiff-Appellant,

v.

K.G.,

    Defendant-Respondent,

and

U.O.,

    Defendant-Appellant.
_____

Argued March 10, 2021 – Decided April 13, 2021

Before Judges Whipple, Rose, and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FD-09-1010-15.

Bonnie C. Frost argued the cause for appellants (Einhorn, Barbarito, Frost & Botwinick, PC, attorneys; Bonnie C. Frost and Jessie M. Mills, on the briefs).

Adam C. Brown argued the cause for respondent (Freeman Law Center, LLC, attorneys; Adam C. Brown, of counsel and on the brief).

PER CURIAM

In this appeal we are asked to determine whether the Family Part judge abused his discretion when he ordered a modification of a custody and parenting time order without a plenary hearing. The appellants, C.O. (Cecilia)[1], paternal grandmother and custodial caregiver of the child, M.O. (Maria), and U.O. (Oscar), Maria's biological father, argue a plenary hearing was necessary to determine whether respondent, K.G. (Kayla), Maria's biological mother, is fit to have overnight parenting time with Maria. We reverse and remand for a plenary hearing.

Maria was born in December 2013 to Kayla and Oscar. Maria has lived with Cecilia and her husband since she was three weeks old. Kayla has four children in addition to Maria, who have different fathers and differing parenting arrangements.

Kayla stayed overnight with Maria at Cecilia's home intermittently before the first custody order was entered. On March 10, 2015, the previous Family Part judge granted joint legal custody of Maria to Cecilia, Kayla, and

---

[1] We use initials and pseudonyms for the parties' names in the interest of protecting their confidentiality, pursuant to Rule 1:38-3(d)(13).

Oscar. Cecilia had sole residential custody, while Kayla was provided liberal parenting time, including overnights. Kayla was required to give Cecilia advance notice regarding parenting time.

On October 6, 2015, Cecilia obtained a temporary restraining order (TRO) against Kayla, because Kayla threatened her with violence. Ten days later, the TRO was dismissed. In June 2016, concerned with what she described as Kayla's "erratic behavior," Cecilia filed an application requesting that Kayla be ordered to undergo an evaluation by a mental health professional and to suspend Kayla's custody and parenting time. On July 19, 2016, the court, with consent of the parties, suspended Kayla's overnight parenting time and reduced Kayla's parenting time to four hours on Fridays and five hours on Saturdays. The court's reasons were placed on the record by a different judge, but we have not been provided with that transcript. Nor did the trial court, on this motion, inquire as to the reasons for modifying Kayla's parenting time and custody from that record.

The parties dispute whether Kayla continued to consistently exercise her right to this parenting time or complied with psychotherapy and a mental health evaluation. Further, it is unclear to this court whether she was ordered to do so, as the order contained no such requirements.

3

On July 7, 2020, Kayla moved for modification of the custody order, requesting joint residential custody of Maria, and fifty-fifty parenting time. In her application, Kayla alleged she asked on multiple occasions if Maria could sleep over and on all occasions was told no.[2] She also stated she wanted to spend more time with her daughter. She explained that because she and Cecilia had constantly argued and she kept getting kicked out, Kayla, Oscar and Cecilia agreed they should share joint custody of Maria, and Kayla could visit Maria whenever she wanted. Kayla asserted at one point she and Cecilia had a heated argument and was told to leave Cecilia's house along with her oldest daughter, A.A. (Ashley), and had to go to a hotel. Kayla alleged that is why Cecilia filed for a TRO and for modification of the custody order.

Although the TRO was dismissed, Kayla asserted because she was living in a hotel room, the court granted Cecilia residential custody, and Kayla was only allowed to pick Maria up on Fridays from 3:00 p.m. to 7:00 p.m. and Saturdays from 9:00 a.m. to 2:00 p.m. To support her capability to have overnights with Maria, Kayla noted that she bought a bunk bed, so Maria has her own bed, but Cecilia still refused. Kayla further asserted that now she has her own apartment in Jersey City and lives with her fiancé, along with his

---

[2] The custodial order in place did not allow overnights.

A-0181-20

child, and her daughter Ashley, and Maria, would share a room with the bunk bed. Moreover, Kayla said, she now has a job as a full-time pharmacy technician.

Cecilia and Oscar both opposed Kayla's application with certifications describing Kayla as erratic, unstable, suicidal, and volatile. They challenged Kayla's factual assertions about her parenting, her job, and apartment as disingenuous, and they reported a different chain of events. They further argued Kayla was required to undergo an evaluation and attend therapy and had not done so.

The trial court held two telephonic hearings on August 3 and August 12, 2020. Cecilia and Oscar were represented by counsel, and Kayla appeared pro se. All three adults testified at the first hearing, and some of the transcript is indiscernible. Remarkably, no parties were provided an opportunity to conduct cross-examination. Kayla reiterated what was presented in her motion. Oscar told the court he opposed Kayla's request and he had taken Kayla to the hospital because she was suicidal on more than one occasion. Cecilia certified in her opposition papers that she witnessed Kayla physically punish two of her other children by hitting them and digging her nails into Ashley's arm.

5

After considering the testimony and reviewing the prior custody orders, the judge said the following:

> First, this is an analysis of custody and parenting time[,] not between the two parents of the child, but between her grandmother and the mother of the child. And I'll say that it's pretty clear under New Jersey law, grandparents do not have the same legal rights to custody and parenting time that the natural parents do. So I don't need to find any changed circumstances to justify revisiting what has been going on for these past few years.

The court found Oscar's testimony biased: "his interests and [his] mother's interests are the same. But [he] clearly has an interest and a bias in the case. Might be making this out to be something more than it is." No medical records or other proofs were submitted by either side on this point.

The court questioned Kayla regarding her employment status; she testified she was a "full[-]time pharmacy technician . . . ." However, when Kayla presented tax documents in support of this employment, the court found Kayla was not credible and had misrepresented her full-time status. Nevertheless, the judge found Kayla was employed less than full-time, was attending school, had an apartment lease, and raises other children. The judge indicated he would put steps in place to grant Kayla's application.

A-0181-20

Following the August 13, 2020, hearing, the court issued two orders, both entered on August 18, 2020. In the first order, which took effect the day after the hearing on August 14, 2020, Kayla was granted parenting time for the first four weeks, with a schedule of Fridays from 3:00 p.m. until 7:00 p.m. and Saturdays from 9:00 a.m. to 8:00 p.m. For the subsequent six weeks, Kayla's parenting time with Maria was set to increase to include overnights: every Friday at 3:00 p.m. until Saturday at 8:00 p.m. And after those ten weeks passed, Kayla would be permitted to file an application to reassess her custody and parenting time. In the second order, the court required inspection of Kayla's home after the ten weekend visits. On September 7, 2020, Cecilia filed an emergent application with this court, requesting a stay of the trial court's August 18, 2020 order, which was denied. This appeal followed.

We review a trial judge's interpretation of law de novo. "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995). The general rule is that findings by a court are "binding on appeal when supported by adequate, substantial credible evidence." Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974) (citing N.J. Turnpike Auth. v. Sisselman, 106 N.J. Super.

7

358 (App. Div. 1969)).  "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice."  <u>N.J. Div. of Youth & Family Servs. v. E.P.</u>, 196 N.J. 88, 104 (2008) (quoting <u>N.J. Div. of Youth & Family Servs. v. G.L.</u>, 191 N.J. 596, 605 (2007)).

"'[A] judgment involving the custody of minor children is subject to modification at any time upon the ground of changed circumstances.'"  <u>Innes v. Carrascosa</u>, 391 N.J. Super. 453, 500 (App. Div. 2007) (quoting <u>Sheehan v. Sheehan</u>, 51 N.J. Super. 276, 287 (App. Div. 1958)).  A parent seeking to modify parenting time must show changed circumstances and that the modification is in the best interests of the child.  <u>Finamore v. Aronson</u>, 382 N.J. Super. 514, 522-23 (App. Div. 2006) (citing <u>Todd v. Sheridan</u>, 268 N.J. Super. 387, 389 (App. Div. 1993); <u>Masterpole v. Masterpole</u>, 181 N.J. Super. 130, 136 (App. Div. 1981)).  "A custody arrangement adopted by the trial court, whether based on the parties' agreement or imposed by the court, is subject to modification based on a showing of changed circumstances, with the court determining custody in accordance with the best interests standard of N.J.S.A. 9:2-4."  <u>Bisbing v. Bisbing</u>, 230 N.J. 309, 322 (2017) (citing <u>Beck v. Beck</u>, 86 N.J. 480, 496 n.8 (1981)).

A-0181-20

N.J.S.A. 9:2-4(c) sets out the statutory factors for a best interests analysis, requiring that

> [i]n making an award of custody, the court shall consider but not be limited to the following factors: the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children. A parent shall not be deemed unfit unless the parents' conduct has a substantial adverse effect on the child.

When examining a request for change in custody, the court must consider the challenging parent's fitness and the welfare of the children. Sheehan, 51 N.J. Super. at 290. To determine fitness, "[t]he court will look to the 'character, condition, habits and other surroundings'" of the parent. Id. at 291 (quoting Clemens v. Clemens, 20 N.J. Super. 383, 392 (App. Div. 1952)). The consideration of the child's welfare means the "'safety, happiness,

A-0181-20

physical, mental and moral welfare of the child.'" Id. at 291 (quoting Fantony v. Fantony, 21 N.J. 525, 536 (1956)). This "concerns more than the physical well-being resulting from the furnishing of adequate food, clothing and shelter. It concerns, inter alia, the spiritual and social welfare of the child." Id. at 292. A party seeking such custody modification bears the burden of proof to demonstrate that the status quo is no longer in the best interest of the child. Bisbing, 230 N.J. at 322.

As the party seeking modification, it was Kayla's burden to prove that such a modification of the July 2016 custody order would be in Maria's best interest. This burden can be met only if she is able to show that a substantial change in circumstances has occurred since the custodial agreement had been put in place. See Finamore, 382 N.J. Super. at 522; Todd, 268 N.J. Super. at 398; Mastropole, 181 N.J. Super. at 136; Sheehan, 51 N.J. Super. at 276.

This standard applies regardless of whether custody was granted to a third party or a natural parent. Todd, 268 N.J. Super. at 397-98. This court emphasized in Sheridan that the third party who is:

> able to show that he or she stands in the shoes of a parent to the child and thus in parity with the natural parent . . . should be accorded the status of a natural parent in determining the standard to be applied to the quest for custody. In such circumstances, the best interests test should apply.

10

[Ibid. (citing Zack v. Fiebert, 235 N.J. Super. 424, 432 (App. Div. 1989)) (holding that there is no one standard that applies in every third-party custody case; "the standard to be applied depends on the status of the third-party [vis-à-vis the natural parent and the child.").]]

Here, the trial court applied an incorrect legal standard. The judge failed to recognize that Maria had lived with Cecilia since she was three-and-a-half-weeks old, and Cecilia was her primary caretaker since the March 2015, order granting physical custody of Maria to Cecilia. It is clear that while Kayla has had parenting time and retains parental rights and joint legal custody, Cecilia stands in the shoes of a parent to Maria. Therefore, the burden in this matter to show a change of circumstances rests with the parent who seeks modification, Kayla.

In K.A.F. v. D.L.M., 437 N.J. Super. 123 (App. Div. 2014), we addressed whether a third party has custodial rights as a psychological parent to a child. There, a former domestic partner sought custodial and parenting rights to a child as a psychological parent. Id. at 127. We acknowledged the constitutional rights of natural parents, while cautioning that the fundamental liberty interest in parenting "is not absolute." Id. at 131-32. "The presumption in favor of the parent will be overcome by 'a showing of gross misconduct,

A-0181-20

unfitness, neglect, or "exceptional circumstances" affecting the welfare of the child[.]'" Id. at 132 (alteration in original) (quoting Watkins v. Nelson, 163 N.J. 235, 246 (2000)). The "exceptional circumstances" category includes "psychological parent cases in which a third party has stepped in to assume the role of the legal parent" and "does not require proof that a parent is unfit." Id. at 132 (quoting V.C. v. M.J.B., 163 N.J. 200, 219 (2000)).

Courts look at four factors in deciding whether a third party has attained standing as a child's psychological parent: "[T]he legal parent must consent to and foster the relationship between the third party and the child; the third party must have lived with the child; the third party must perform parental functions for the child to a significant degree; and most important, a parent-child bond must be forged." Id. at 133 (alteration in original) (quoting V.C., 163 N.J. at 223).

Based on our review of the record, the trial court engaged in improper burden shifting when it stated that Cecilia was merely a "non-parent" grandmother to Maria. The judge was incorrect when he stated "the courts have made it an extra burden for non-parents that have to prove [custody or parenting time] by clear and convincing evidence, not the regular preponderance of evidence. There is a stronger burden." While applicable in

A-0181-20

other cases, this statement of law fails to address the fact that Cecilia is not a mere non-parent.

Moreover, the trial court here found a change of circumstances during the two August hearings based on cursory review of the current custody arrangement. Notably, the judge had not explained how these were adequate changes of circumstances, nor what the circumstances had been previously. Our review of the record reveals it is replete with unresolved factual issues and no application or analysis of the N.J.S.A. 9:2-4(c) factors. Moreover, the record is barren of any discussion of Rule 1:40-5 screening for mediation, a favored procedure.

In J.G. v. J.H., 457 N.J. Super. 365, 372-73 (App. Div. 2019), we said:

> A thorough plenary hearing is necessary in contested custody matters where the parents make materially conflicting representations of fact.
>
> A court, when presented with conflicting factual averments material to the issues before it, ordinarily may not resolve those issues without a plenary hearing. While we respect the family court's special expertise, a court may not make credibility determinations or resolve genuine factual issues based on conflicting affidavits . . . . Moreover, a plenary hearing is particularly important when the submissions show there is a genuine and substantial factual dispute regarding the welfare of children.
>
> . . . .

13

"[T]he matter of visitation is so important, especially during the formative years of a child, that if a plenary hearing will better enable a court to fashion a plan of visitation more commensurate with a child's welfare . . . it should require it."

[(quoting Wagner v. Wagner, 165 N.J. Super. 553, 555 (App. Div. 1979)); see also Faucett v. Vasquez, 411 N.J. Super. 108, 118-19 (App. Div. 2009) (stressing the need for a plenary hearing even prior to a temporary modification of custody).]

Much like J.G., the proceeding that took place here did not constitute a plenary hearing. The judge asked the parents questions, going back and forth between them. The parties were not given an opportunity to exchange discovery, retain an expert witness, call witnesses or cross-examine each other. For this reason alone, we are constrained to reverse and remand for a plenary hearing. And coupled with the misapplication of the law, we remand this case to be assigned to a different judge. R. 1:12-1(d).

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

14